## RITCH et al. v. PUGET SOUND BRIDGE & DREDGING CO., Inc., et al.

### No. 11150.

Circuit Court of Appeals, Ninth Circuit.
June 20, 1946.

Florence Mayne, of Seattle, Wash., for appellants.

J. Charles Dennis, U. S. Atty., and Frank Pellegrini and Tom A. Durham, Asst. U. S. Attys., all of Seattle, Wash., for appellees.

Before GARRECHT, DENMAN and BONE, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment denying to appellants recovery from their appellee employers, hereinafter called the dredging contractors, overtime payments under Section 207 of the Fair Labor Standards Act of 1938, 29 U.S.C. 207, 29 U.S.C.A. § 207.[1] Appellants contend that their employment is both "in commerce" and in "the production of goods for commerce" as those phrases are used in that Act. The principal facts are stipulated.

The dredging contractors are private contractors engaged in the dredging of two channels in the harbor of. the Bremerton Navy Yard in the navigable waters of Puget Sound, extensively used for inter-

---

[1] "Sec. 207.   Maximum hours.
"(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is *engaged in commerce or in the production of goods for commerce*
\* \* \* \* \* · \* \* \*
"(3) For a workweek longer than forty

hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."
(Emphasis supplied.)

state commerce, deepening such navigable waters onwards towards the Navy Yard. For the continued deepening of the navigable waters, the dredging contractors were building, as the lower portion of a pier structure beginning in these navigable waters and extending to the Navy Yard shore, on each lower side of the pier, retaining walls on the pier side of each channel to prevent silting from the tide waters working in and out under the pier. The dredging contractors were to construct on the pier the dredging apparatus to dredge the channels alongside and keep the depth of water sufficient for the vessels navigating the Puget Sound waters into and out of the channels and berths.

Up to the time of the construction of the pier naval ships could navigate in the waters of the Sound and anchor at what is now the outer portion of the pier and be served by barges and otherwise for their repair. The channels which thus are deepening the navigable waters from the pier head inshore are improvements of the Bremerton harbor. Such a "harbor" and "waterway" is defined by paragraph IV of the interpretive bulletin G-162 of May 15, 1941, of the Wages and Hours Division as "essential instrumentalities of interstate commerce." The channels and berths are thus but the deepening of an existing facility. Likewise the bulletin defines a pier with such retaining walls as such an instrumentality. It is an addition to other such facilities of the Navy Yard.

The dredging contractors also are constructing as a part of the pier the mechanical facilities for the repair of combat vessels of the Navy and railway tracks on the pier connected with the railway system of the Navy Yard for the carriage of materials for such repair.

The channels and berths of the pier are to be used by combat vessels moving in the navigable waters of Puget Sound into and resting in and moving out of the berths. The repair facilities are intended to be used for such combat vessels.

Congress by direct legislation and the President acting under Congressional grant of power, have given to naval combat vessels many non-combat functions in maritime commerce. It has defined the word "commerce" as used in the Fair Labor Standards Act, 29 U.S.C. Sec. 203, 29 U.S.C.A. § 203, as "'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

The construction of these terms is under the rule stated in Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460, and Overstreet v. North Shore Corporation, 318 U.S. 125, 128, 63 S.Ct. 494, 87 L.Ed. 656, "It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce." [317 U.S. 564, 63 S.Ct. 335.]

All vessels of the Navy, including combat vessels, are radio stations which may engage in "communications" in the transmission of commercial radio messages from the home offices in the states to commercial vessels at sea. 47 U.S.C. §§ 327, 360, 47 U.S.C.A. §§ 327, 360. The latest provision for the compensation for such communications appears in Appendix III to Communications Instructions United States Navy, D.N.C. 5, setting up rates and procedures for "Toll traffic."

Combat vessels also are engaged in the transport of the mails of non-combatants as well as combatants under contracts with the Postmaster General.[2] They also engage in the "transportation" of the goods of private persons under bills of lading issued by the officers of such ships, for which Article 1815 (4c) of the Shipping Guide of the Bureau of Supplies and Accounts sets up the rates and procedure. This is now done with the cooperation of the War Shipping Administration under the authority of Executive Order 9054, of February 7, 1942, 50 U.S.C.A.Appendix, § 1295 note, Cum. Supp. C.F.R. chap. 3.

All naval vessels are engaged in the transportation from out of the states of commercial merchandise which is sold as an ordinary commercial transaction at a profit

---

[2] Post Offices, although performing a governmental function, are among the facilities of interstate commerce as defined in interpretive bulletin G-162, supra.

to those on board. United States Navy Regulations of 1920, Arts. 1402, 1403, 1404.

While witness Jacks (status not given) stated that the new pier itself "was not intended to be used as a commercial freight pier, but *rather* for mooring combat ships undergoing overhaul," Congress has provided that under orders of regulations of the Secretary of the Navy the "government force at a Navy Yard" may work on merchant ships "for private individuals or corporations." 34 C.F.R. § 1, 1995.

Congress in 1918 authorized the use of Naval vessels in the salvage for compensation of merchant ships, including, of course, those sailing from a state. 34 U.S.C.A. § 472. Cf. The Impoco, D. C., 287 F. 400, where the United States officers and crew of an Army transport were awarded compensation for the salvage of a merchant vessel; The Borgfred, Virgin Islands, 1936 A.M.C. 804, 806.

■ Apparently none of these commercial uses of combat ships and of naval construction facilities shown in legislation and regulations of which we take judicial notice was called to the attention of the district court. That court dismissed the complaint on the ground that the channels and pier were "for the exclusive use of the United States Navy. They were not for general commerce or for any commerce except the use of the Navy." [60 F.Supp. 670, 672].

■ Since the combat ships are so engaged in commerce for the use of private persons, that is in transportation, transmission and communication for such persons, the contractors' deepening of the navigable waters by the channels, with the retaining walls to prevent the silting of the channels from the pier sides, for the ships' navigation into the berths, is engaging in commerce as in Walling v. Patton Tulley Transportation Co., 6 Cir., 134 F.2d 945, 947. There the contractor was constructing new facilities on the dikes and revetments of the Mississippi and Missouri Rivers. It was contended that they were not "in commerce" within the Fair Labor Standards Act because they were "not yet employed in interstate commerce." The court held no merit in this contention, stating (134 F.

2d at page 947), "The short answer is that the Mississippi River has been a highway of interstate commerce since states were first carved out of its contributory territory, and so the reasoning that construction upon a highway not yet utilized for interstate commerce is not work in interstate commerce does not apply."

This holding of the Patton-Tulley decision that improving existing waterways in interstate commerce is engaging in commerce is recognized and the case distinguished in Nieves v. Standard Dredging Co., 9 Cir., 152 F.2d 719, where the dredging for a Naval station was inland to be later connected with navigable waters, and in Brue v. J. Rich Steers, Inc., D. C., 60 F. Supp. 668, 670, where the building under construction "fronts the river and extends into the river, it was not intended as an aid to commercial navigation; has no relation to river traffic; has no more effect on the current or flow than any building fronting on the river." So also is distinguishable our early decision in Raymond v. Chicago, M. & St. P. R., 9 Cir., 233 F. 239, where the tunnel under construction was entirely disconnected from the existing railway line, and Barbe v. Cummins Construction Co., D.C., 49 F.Supp. 168, 172; Id., 4 Cir., 138 F.2d 667, and Noonan v. Fruco Construction Co., 8 Cir., 140 F.2d 633, where the buildings were not in any way connected with any extension of harbor facilities.

■ That the facility worked on need not be employed in commerce during its construction is held by the Supreme Court in Pedersen v. Fitzgerald, 318 U.S. 740, 742, 63 S.Ct. 558, 87 L.Ed. 1119, where the contractors' employees were constructing new abutments for a bridge destroyed by a flood, the new abutments never having been used in interstate commerce.

It is contended that the Wage & Hour Division in paragraph 12 of its bulletin No. 5 of December, 1939, took a definite position against considering such deepening and extension of the navigable waters of the harbor of the Navy Yard in its statement that "The question arises whether the employees of builders and contractors are entitled to the benefits of the Act. The employees of local construction contractors

generally are not engaged in interstate commerce and do not produce any goods which are shipped or sold across state lines. Thus it is our opinion that employees engaged in the original construction of buildings *are not generally* within the scope of the Act, even if the buildings when completed will be used to produce goods for commerce. There may be particular employees of such construction contractors, however, who engage in the interstate transportation of materials or other forms of interstate commerce and are for that reason entitled to the benefits of the Act." (Emphasis supplied.)

The pertinent phrase is "are not generally within the scope of the Act." Later, in May, 1941, in paragraph II of Bulletin G-162, supra, the Division made specific exceptions to this general rule with respect to which it "does not take a definite position." The exceptions are stated in paragraph IV to include the improvement of harbors and waterways and construction of such wharves and docks and other structures which facilitate the movement of goods in interstate commerce.[3]

■ The dredging contractors paid time and a half for overtime to all its employees engaged in constructing the channels, berths, retaining walls and pier, except the appellants and six others. The distinction seems to be made on the theory that they were so-called "White Collar" workers.

Five of them were draftsmen engaged in designing and laying out the work to be done by others in the contracted dredging and dredging plant on the pier with its retaining walls. Three were timekeepers engaged in keeping the time of all who worked on the project. In our opinion they were as much engaged in the construction of the channels inward from Puget Sound and the retaining walls and dredging installation on the pier to keep open the channels and berths as were the men dredging the channels and berths, the cement men working on the retaining walls and the mechanics installing the permanent dredging apparatus on the pier—all pursuant to the draftmen's plans and the time kept by the timekeepers. Since such work is in commerce, the men so actually engaged in it are in commerce and entitled to time and a half pay for their admitted overtime work. They have the immediacy of participancy lacking in the cook of McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, cited in Armour & Co. v. Wantock, 323 U.S. 126, 131, 65 S.Ct. 165, 167, 89 L.Ed. 118.

Appellants also claim that insofar as they are working on a repair plant for ships in commerce they are engaged in a process necessary to the production of goods for commerce within the provisions of Sections 203 (i) and 203 (j) of the Fair Labor Standards Act.[4]

---

[3] "Railroad tracks, equipment and facilities; highways; city streets over which interstate commerce regularly travels; rivers, streams, harbors and other waterways used more or less regularly in the interstate transportation of goods; bridges over which interstate commerce more or less regularly travels; pipe lines used for the interstate transportation of liquids and gas; dams, the effect of which is to enhance and improve navigable waters as instrumentalities of commerce; wharves and docks which directly facilitate the movement of goods in interstate commerce; telephone and transmission lines; telephone exchanges; telephone buildings and post office. This list is not intended to be exhaustive * * *."

At the time of this bulletin G-162 the Wage and Hour Division did not have before it the decisions in the Patton-Tulley and Pedersen cases, supra.

[4] Section 203(i) provides

" 'Goods' means goods (*including ships and marine equipment*), wares, products, commodities, merchandise, or articles or *subjects of commerce* of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." (Emphasis supplied.)

Section 203(j) provides

" 'Produced' means produced, manufactured, mined, handled, or in *any other manner worked* on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or *in any other manner working on such goods, or in any process or occupation necessary to the production thereof*, in any State." (Emphasis supplied.)

**338**

The argument is that since ships are goods, their repair is an "other manner" of working on them and that the repair plant on a pier is a "process" necessary for working on them. Since the construction of the channels, berths and retaining walls brings appellants' employment "in commerce," it is not necessary to pass upon the further contention respecting the working on the repair plant on the pier as constituting the production of goods for commerce.

The judgment is reversed.