**SCHOLL v. McWILLIAMS DREDGING
CO. et al.**

No. 133, Docket No. 20828.

Circuit Court of Appeals
Second Circuit.

July 21, 1948.

CLARK, Circuit Judge, dissenting in part.

John F. X. McGohey, U. S. Atty., and Henry L. Glenn, Asst. U. S. Atty., both of New York City, for defendants-appellants McWilliams Dredging Co. and Nick F. Helmers, Inc.

Krisel, Lessall & Dowling, of New York City (Henry Brickman, of New York City, of counsel), for plaintiff-appellee William Scholl.

Before AUGUSTUS N. HAND, CLARK, and WOODBURY, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The above plaintiff, William Scholl, sued to recover from the defendants McWilliams Dredging Company and Nick F. Helmers, Inc., unpaid overtime compensation for the period of his employment from June 20, 1942, to January 22, 1944, and an additional amount as liquidated damages pursuant to Section 16(b) of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 216(b). The defendants are corporations—McWilliams being organized under the laws of the State of Illinois and Helmers being organized under the laws of the State of New York. As co-adventurers under a War Department contract dated August 2, 1941, these defendants agreed to provide engineering services for construction of certain outlying bases in Greenland. They were required to furnish labor, materials, tools, equipment (including dredging and construction plant), supplies not furnished by the government, and services necessary for the field design, layout, engineering supervision and construction of the installations in Greenland.

The Engineering Department of the defendants carried out the field design, layout, preparation of specifications and the formulation of mechanical requirements including necessary re-design. The completed plans and specifications were submitted for approval to the North Atlantic Division of the U. S. Engineer's Office. From the plans which were approved and returned, schedules of the quantities of materials required were prepared and submitted, together with the applicable specifications, to the Purchasing Department of the defendants for requisition. The approved plans and specifications were then forwarded to the project for use in construction. Materials and equipment were procured by direct government purchase or by the defendants themselves upon receiving prior government approval. A very substantial part of these purchases came from outside the States of New York and Massachusetts. Title to these goods passed to the government and shipment was made to the Corps of Engineers at either Claremont Terminal in New Jersey or a terminal at Framingham, Massachusetts. They were subsequently transported to Greenland on vessels supplied by the government where they were used in the construction. The record does not disclose the specific uses for which the base

was intended but there is testimony that the work included the construction of hangars, barracks, mess halls, hospitals, pumping stations, laundries, docks trailways, railways, pipe lines, power stations, and electrical distribution systems.

The plaintiff worked in the New York office of the defendants, designing or drafting plans for the electric light and power layouts for certain of the buildings to be constructed in Greenland. For this work he was supplied with the architect's plan of the particular building, a mechanical plan containing the location of electrically-driven machinery, and other information contained in the specifications, manuals, and directives. Plaintiff also performed some material takeoff work in the New York office, preparing from the approved plans specific lists of the materials which would be required for the particular jobs. These lists were sent to the defendants' Purchasing Department and served as a basis for requisitions. In addition, between August 4, 1943 and sometime in December, 1943, plaintiff made several trips to the Framingham terminal, remaining there on each occasion "a couple of days." While there he was engaged in pointing out and separating those materials to be shipped to the base in Greenland and those to remain at the terminal. In some cases the designation of the materials to be shipped was not accompanied by any breaking of bulk, but in other instances boxes were opened in order to separate the portions of the cargo which were selected to go forward to the base.

The District Court held that the services rendered by the plaintiff were within the coverage of the Fair Labor Standards Act and that they were not of such a nature as to exempt him from the Act as an administrative or professional employee. 52 Stat. 1060, 29 U.S.C.A. §§ 206, 207, 213. If the plaintiff should be held to be covered by the Fair Labor Standards Act the amount of the overtime compensation due him was stipulated to be $551.76, which the District Court awarded him as well as liquidated damages to the same amount, $165.52 as attorneys' fees and $25 costs, making a total of $1,294.04. From a judgment for the plaintiff for that amount the defendants have appealed.

Pertinent portions of Sections 6 and 7 of the Fair Labor Standards Act which govern the wages of employees who are covered by the Act are set forth in the margin.[1] The basic question presented is whether plaintiff should be considered as "engaged in commerce or in the production of goods for commerce"[2] and shall for that reason be held to come within the provisions of the Act. The answer to this question depends upon the character of this employee's activities and not upon the nature of his employer's business. Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Laudadio v. White Const. Co., 2 Cir., 163 F.2d 383. Plaintiff contends that his work was in several respects of such a type as to bring him within the Act.

His first claim is that his work constituted an engagement in commerce because it was directly connected with the construction of an instrumentality of commerce, to wit: the base at Greenland. We believe that at least for the purposes of this Act the base should be considered as

---

[1] Section 6, 29 U.S.C.A., § 206 (a), regarding minimum wages, reads:

"Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates— * * * *"

Section 7, 29 U.S.C.A., § 207 (a), regarding maximum hours and compensation for excess hours, reads:

"No employer shall * * * employ any of his employees who is engaged in commerce or in the production of goods for commerce—* * * [for a work week longer than specified in the section] unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

[2] Sections 3 (b) and (c) of the Act, 29 U.S.C.A. §§ 203 (b) and (c) read as follows:

"(b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof.

"(c) 'State' means any State of the United States or the District of Columbia or any Territory or possession of the United States."

being later used as an instrumentality of commerce rather than solely as an instrumentality of war. The record does not disclose the uses to which this base was to be put, but we can safely assume that it was later used for purposes of commerce, as, for example, to facilitate the transportation of persons, mail and articles of commerce in general, and not solely for military purposes such as training of personnel, or for purely combat activities. Such a conclusion meets the tests we applied in other like situations in our recent decisions in Divins v. Hazeltine Electronics Corp., 2 Cir., 163 F.2d 100, and Laudadio v. White Const. Co., supra. The difficulty, however, with treating the plaintiff as covered by the Act is that his work did not relate to repair or even to reconstruction of an existing instrumentality of commerce but to completely new construction. This we recently held in Laudadio v. White Const. Co., supra, did not bring the employee within the Act. A similar result was reached by the First Circuit in Nieves v. Standard Dredging Corp., 152 F.2d 719. See also Kelly v. Ford, Bacon & Davis, 3. Cir., 162 F.2d 555; Wells v. Ford, Bacon & Davis, Inc., 6 Cir., 145 F.2d 240; Brue v. J. Rich Steers, Inc., D.C.S.D.N.Y., 60 F.Supp. 668; Damon v. Ford, Bacon & Davis, D.C.E.D.Pa., 62 F.Supp. 446. Completely new construction has not been regarded as having a close enough relation to actual movements in commerce to subject the employer to the provisions of the Act. The decision in Pederson v. J. T. Fitzgerald Const. Co., 318 U.S. 740, 742, 63 S.Ct. 558, 87 L.Ed. 1119; Id., 324, U.S. 720, is not contrary for the work there consisted of reconstruction and repair of existing facilities of a railroad which had previously been used in interstate commerce. In Walling v. McCrady Const. Co., 3 Cir., 156 F.2d 932, Ritch v. Puget Sound Bridge & Dredging Co., 9 Cir., 156 F.2d 334, and Walling v. Patton-Tulley Transp. Co., 6 Cir., 134 F.2d 945, it was held that even certain new construction work relating to existing instrumentalities of commerce brought the employees of the contractor within the Act. These decisions however expressly stressed that the work was upon instrumentalities which had already been used in interstate commerce, distinguishing the construction of new installations which had not been devoted to commerce before. See Kelly v. Ford, Bacon & Davis, supra. The cases may be of doubtful authority in view of our decision in Laudadio v. White Const. Co., supra, where we held that though work of reconstruction and extensions of existing facilities of interstate commerce at Floyd Bennett Airfield was covered by the Act, work relating to construction of new facilities there was not. However, to deny coverage to the plaintiff in the case at bar is consistent with these decisions for the undertaking upon which plaintiff was working was the construction of a new base that was later to be used for interstate commerce. It might be argued that the moment any part of the Greenland base might be used in commerce, though before completion of the entire installation, employees who worked on the remainder would come within the Act. Such a theory would make the exemption accorded to construction of a new instrumentality of commerce contingent upon the use of any part of the uncompleted base and dependent upon an uncertain test which we do not find recognized by the authorities. We hold that this undertaking for the construction of the Greenland base retains until its completion the status which it had at the beginning. In any event, under our decision in Laudadio v. White Const. Co., supra, the construction of new facilities would not seem to be covered by the Act even though there may also have existed at the same installation other facilities which had been used in commerce.

 Plaintiff next contends that his work at the New York office in the preparation of plans sent for use to the Greenland base and to other states constituted his engagement in the production of goods for commerce. In our opinion this work cannot be so considered since the use of these plans by defendants was merely incidental to the performance of their local construction contract in Greenland. Bozant v. Bank of New York, 2 Cir., 156 F.2d 787; Kelly v. Ford, Bacon & Davis, supra; Collins v. Ford, Bacon & Davis, D.C. E.D.Pa., 66 F.Supp. 424, decision on re-

hearing, 71 F.Supp. 229. The making of these plans was not the objective undertaken by the defendants, nor did they sell them as "goods," but only used them for the transmission of information in the performance of their construction contract which we have already held was not engagement in commerce.

The plaintiff also claims that he is brought within the coverage of the Act by his work in preparing take-off lists and lay-out plans which specified materials, supplies and equipment for use in Greenland which were later obtained by defendants from other states and thus moved in interstate commerce. We held as to a similar situation in Laudadio v. White Const. Co., supra [2 Cir., 163 F.2d 387], that such work was insufficiently related to commerce unless "the bills of materials included items which the purchasing department necessarily had to order from sources outside the state." As we there said, if the items listed in bills of material could have been obtained either from within or outside the state so that the decision as to which source to utilize rested wholly within the discretion of the purchasing department of the defendant, plaintiff's work would not be covered by the Act although in fact the goods were actually ordered from outside the state. In other words, the plaintiff's relation to commerce was regarded as too remote unless his work necessarily caused the goods to be ordered for transportation in interstate commerce. The foregoing would seem to be the most favorable view to plaintiff which can be applied here, if indeed it may not give him protection under the Act in particular instances in which his relation to commerce would seem to be somewhat shadowy. Since the present record does not permit us on appeal to apply the test we have indicated, it will be necessary to reverse and remand in respect to the claim of plaintiff for coverage of his work based upon defendants' purchases of goods in interstate commerce. Such remand is in order to ascertain whether any substantial part of plaintiff's work necessarily caused goods to be purchased in interstate commerce. That it must be substantial is indicated by the following decisions: Walling v. Jack-

sonville Paper Co., 317 U.S. 564, 572, 63 S.Ct. 332, 87 L.Ed. 460; Divins v. Hazeltine Electronics Corp., supra; Skidmore v. John J. Casale, Inc., 2 Cir., 160 F.2d 527.

The plaintiff finally contends that he was engaged in commerce on certain occasions between August and December, 1943, while working for defendants at Framingham, Massachusetts. He states that while at the terminal there he worked on breaking down cargo which had been shipped from other parts of the country to be forwarded to Greenland. This work if it was substantial in amount and related to the handling of goods and equipment that were being shipped in commerce would seem to bring him pro tanto within the Act. We hold that such activities by the plaintiff would be so closely related to the movement of commerce as to be a part of it. This claim based upon plaintiff's work at Framingham requires a remand to the District Court to determine whether any work of his at Framingham in selecting equipment which was in the course of shipment to Greenland was substantial in amount.

The defendants argue that the plaintiff was exempt from coverage under Section 13 of the Act, 29 U.S.C.A. § 213, because he was engaged in an administrative or professional capacity. The District Court held that he was not exempt under either classification, and we think its findings in this respect are supported by the evidence. Upon remand the District Court can consider any defenses arising under the Portal-to-Portal Act of 1947, 29 U.S. C.A. § 251 et seq. See 149 Madison Ave. Corp. v. Asselta, 331 U.S. 795, 67 S.Ct. 1726, 91 L.Ed. 1822; Alaska Juneau Gold Mining Co. v. Robertson, 331 U.S. 793, 67 S.Ct. 1728, 91 L.Ed. 1821.

For the foregoing reasons the judgment is reversed and the action remanded to the District Court with directions to proceed in accordance with the views expressed in this opinion.

CLARK, Circuit Judge (dissenting in part).

I agree that there must be a remand for consideration of possible new statutory defenses. And if the further remand here

ordered were to supply full findings after a new hearing, I should not have objected in the light of the deficiencies of this record and the admonitions of Kennedy v. Silas Mason Co., 68 S.Ct. 1031; though the missing facts (as to the use of the Greenland base) do seem peculiarly in the knowledge of the defendants and their real principal, the United States of America, and the same questions did not appear unanswerable in Curtis v. McWilliams Dredging Co., City Ct., 78 N.Y.S.2d 317, 320-322. But the directed remand limits the new findings to be made beyond what I conceive to be proper. My understanding is that the Greenland base was in substantial use sometime before this contract of employment was made.[1] And such use, I believe, would in any event include that properly termed "commercial," though, as applied to a recognized air base for the transportation of supplies, personnel, and everything needed for Europe and the war front, the suggested dichotomy between commercial and military use seems to me fanciful and unreal. This, then, was quite literally the expansion of an already existing air base and hence participating work was within the coverage of the Act.

On this basis I should not draw a nice distinction between reconstruction of a hangar or messhall and the addition of a new one (though apparently not even that distinction would defeat plaintiff, in view of the extensive activities actually performed in Greenland). Involved, in any event, was the remaking of an air base to fit the disclosed needs. I am bound to admit that certain expressions—though perhaps not the decisions—in our cited cases do suggest further limitations; but the cases cited from the Third, Sixth, and Ninth Circuits seem to me more nearly to reflect the intent of the Act as interpreted by the Supreme Court. 60 Harv.L.Rev. 154.

[1] See Col. Bernt Balchen, War below Zero: The Battle for Greenland, 1944, 5, 6, 9, 14, 15, 19, 20; New International 1942 Year Book, 255; New International 1943 Year Book, 297; Northeast Airlines, Inc., et al., North Atlantic Route Case, 6 CAB 319, June 1, 1945, approved by the President, July 5, 1945; Det Danske Luftfartselskab A/S (Danish Air Lines), Foreign Air Carrier Permit, 6 CAB 799, March 1, 1946, approved by the President, April 2, 1946. See also Executive Agreement of Dec. 16, 1944, between the United States and the Danish Government, effective Jan. 1, 1945, for the mutual use of the Greenland Air Base, 58 Stat. 1458.