JOHN F. HARTMAIER ET AL., Appellants, v. JOHN C. LONG and ROBERT W. LONG, co-partners doing business as LONG CONSTRUCTION COMPANY, and TURNER CONSTRUCTION COMPANY, a Corporation, joint contracting parties, Respondents, No. 40983—238 S. W. (2d) 332.

Division Two, March 12, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, April 9, 1951.

*Charles W. Hess* and *Roger C. Slaughter* for appellants.

1154

*H. M. Langworthy, Clyde J. Linde* and *Robert B. Langworthy* for respondents; *Langworthy, Matz & Linde* of counsel.

1156

[333] BOHLING, C.—The question upon this review is the right of 114 Plaintiffs (appellants), John F. Hartmaier and others, to recover a total in excess of $100,000 alleged unpaid overtime wages, liquidated damages, and reasonable attorneys' fees under the Fair Labor Standards Act (sometimes herein referred to as [334] the Act) of Congress of 1938, as amended,[1] from John C. Long and Robert W. Long, co-partners doing business as Long Construction Company, and Turner Construction Company, a corporation (respondents).

Trial was to the court without a jury. The judgment was for defendants, who are referred to in the record and herein as "Long-

[1] So stated by plaintiffs and submitted in the trial court. Consult 52 Stat. 1060 et seq.; 53 Stat. 1266; 54 Stat. 615; 55 Stat. 756; 61 Stat. 84 et seq.; 63 Stat. 446, 910-920; 29 U. S. C. (Supp. III) §§ 201-217; 29 U. S. C. A. §§ 201-219.

Under 52 Stat. 1060, §§ 2, 3, 7, 29 U. S. C. A. §§ 202, 203, 207, the Act applies to *labor performed in industries engaged in interstate commerce, or in the production of goods for commerce.* Under 52 Stat. 1063, § 7(a, 3), 29 U. S. C. A. § 207(a, 3), the basic workweek is 40 hours with time and a half for overtime. Such actions are authorized by 52 Stat. 1069, § 16(b), 29 U. S. C. A. § 216(b).

Turner." The case is pending on rehearing.[2] We review the claims of the plaintiffs as suits in equity. R. S. 1949, § 510.310(4).

Plaintiffs contend they "engaged in commerce or in the production of goods for commerce" under the Fair Labor Standards Act as employees of Long-Turner in the construction of the Pratt & Whitney aircraft engine plant near Kansas City, Missouri. They say they worked six 8-hour days, 48 hours a workweek; and since 40 hours is the basic workweek under the Act and 8-hours is the basic work day under the Federal 8-hour day Act,[3] the basic workweek was five days, and the sixth day constituted overtime. Plaintiffs are classified in the record as firemen, guards, surveyors, waterboys, clerks, and a nurse.

Defendants contend (1) that no plaintiff has sustained the burden of establishing that during any workweek while employed by defendants he performed work within the Act; and (2) that in any event the claims are barred by the good faith provisions of § 9 of the Portal to Portal Act of 1947. 29 U. S. C. A. § 258; 61 Stat. 88, § 9.

In April, 1942, Navy Department officials decided upon the construction of a plant for the manufacture of additional Pratt & Whitney aircraft engines, and its operation by a subsidiary corporation to be organized by the United Aircraft Corporation, East Hartford, Connecticut (hereinafter designated United). Several agreements followed.

On August 4, 1942, Defense Plant Corporation (54 Stat. 572, 573, § 5; later the Reconstruction Finance Corporation, 59 Stat. 310), a corporate agency of the United States, agreed with Pratt & Whitney Aircraft Corporation of Missouri (a small wholly owned subsidiary of United and hereinafter designated Pratt & Whitney), to acquire the plant site, construct the plant (buildings, machinery et cetera), and lease the completed plant to Pratt & Whitney for $1.00 a year. Pratt & Whitney was to assist in the selection of the site and was to proceed with the construction and equipment of the plant on behalf of and subject to the approval of Defense Plant Corporation, that is, the

[2]The rehearing was granted after the United States Supreme Court held in Powell v. United States Cartridge Co., 339 U. S. 497, 94 L. Ed. 1017, 70 S. Ct. 755, that the Fair Labor Standards Act applied to employees at a Government-owned munitions plant operated by a private contractor under a cost-plus-a-fixed-fee contract made with the United States and that such an employee was engaged in the production of goods for commerce and was not engaged exclusively in war work for the Government. That case overruled United States Cartridge Co. v. Powell (8th Cir.), 174 F. 2d 718; Aaron v. Ford, Bacon & Davis, Inc. (8th Cir.), 174 F. 2d 730 and Creel v. Lone Star Defense Corp. (5th Cir.), 171 F. 2d 964.

[3]40 U. S. C. A. (1943), §§ 321-326, covering laborers and mechanics who are employed by the Government of the United States or by any contractor or subcontractor, upon a public work in the United States, and establishing a basic 8-hour work day, but not providing for the number of days in a workweek.

Government. All costs connected with the construction of the plant (acquisition of the site, buildings, machinery and its installation) were to be advanced by the Defense Plant Corporation, [335] with title thereto in the Defense Plant Corporation.

Under an agreement, dated September 12, 1942, between the United States, acting through the Navy Department, on the one part, and Pratt & Whitney and United, on the other part, Pratt & Whitney was to operate said plant as agent for the United States, furnishing the management, engineering, and production experience. The title to all materials, parts, equipment et cetera under said agreement was in the Navy Department, the Government, and not in Pratt & Whitney.

Each contract was to be performed by Pratt & Whitney and United without profit, directly or indirectly.

A long written contract was entered into for the construction of the plant between Pratt & Whitney, as Agent for the Defense Plant Corporation, that is, the United States Government, the Owner. The "Owner, Agent and Architect-Engineer" had the right to inspect the work and the right of access to the books, records et cetera at all times.

The contract called for the construction of buildings having approximately 86 acres of floor space, with a manufacturing building of about 2500 by 1700 feet, laid out in squares of 40 feet; and of roads, sidewalks, parking spaces, fences, spur or switch tracks, sewers, and utilities. The contract was on a cost-plus-a-fixed-fee basis with the Owner paying for and having title to all construction equipment, tools, materials and supplies chargeable to the cost of the work.

Construction work started in August, 1942, on a 400 acre plant site, and was completed early in 1944. Several thousand persons were employed in this construction work.

The Secretary of Labor determined the hourly wage rates applicable to mechanics and laborers. They are not involved. He did not include plaintiffs, who were considered "non-manual" employees and whose salary scale and terms of employment were discussed and established by Defense Plant Corporation officials and Long-Turner before construction started. They were paid on a weekly basis, and were not held to exact hours as were mechanics and laborers. They were docked if they missed a day and received extra pay if they worked on the seventh day. Their compensation was set higher than comparable wages and salaries in private industry to secure a full week's work and to finish the task, as each day deducted from the finishing time meant a saving of the lives of the boys in the Armed Services. The construction contract did not provide for the length of the workweek. The Long-Turner payroll accounts were continuously audited, sometimes preaudited, by Government auditors; and payments were made out of funds advanced by the United States Treasury. Long-Turner had to secure the approval of the Defense Plant Corporation

before any wage or salary schedule could be established or any changes could be made therein.

The court found, among other things, that Long-Turner were engaged in original construction work under a contract with Pratt & Whitney as agent for Defense Plant Corporation, a Government agency, with the Government advancing the necessary funds and having title to all construction materials and owning or leasing the construction equipment; that Long-Turner did not process or produce any goods for commerce; that plaintiffs did not receive or unload incoming materials; and that Defense Plant Corporation had approved in August, 1942, all wage rates paid plaintiffs.

The court gave Long-Turner's conclusions of law and embodied them in its judgment that plaintiffs were not engaged in commerce or in the production of goods for commerce within the Fair Labor Standards Act during any workweek while employed by Long-Turner.

Plaintiffs' theory as disclosed by its refused findings of fact and conclusions of law was that the firemen, surveyors, waterboys, the nurse, and a few specifically named employees were engaged in commerce or in the production of goods for commerce during a substantial portion of each and every workweek of their employment by Long-Turner.

[336] Plaintiffs concede they had the burden of proof.[4]

The record presents varied situations. For instance: Some of the plaintiffs worked as a fireman, and as a guard, or as a laborer at different times, and at different stations or places on the 400 acre tract, sometimes at different times within a given week. All of them did not work over or as many as five 8-hour days every week.

As mentioned supra (note 1), "in industries engaged in commerce or in the production of goods for commerce" (29 U. S. C. A. § 202) employers are not to employ any employee "who is engaged in commerce or in the production of goods for commerce * * * for a workweek longer than forty hours * * *, unless such employee" receive time and a half for the hours employed above forty (Id., § 207 (a, 3)).

Some employees may be under the Act while other employees of the same employer, doing a different work, are not. If a substantial part of the employee's activities are within the Act, he is entitled to its protection.[5]

---

[4]Anderson v. Mt. Clemens Pottery Co., 328 U. S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515; Burke v Mesta Machine Co. (W. D. Pa.), 79 F. Supp. 588, 596[2]; Annotations, 169 A. L. R. 1337; 152 A. L. R. 1041.

[5]Kirschbaum Co. v. Walling, 316 U. S. 517, 524, 62 S. Ct. 1116, 86 L. Ed. 1638; Walling v. Jacksonville Paper Co., 317 U. S. 564, 571; 63 S. Ct. 332, 87 L. Ed. 460; Scholl v. McWilliams Dredg. Co. (2 Cir.), 169 F. 2d 729, 733; Jax Beer Co. v. Redfern (5 Cir.), 124 F. 2d 172, 174.

The employee's activities are to be performed with the employer's knowledge and consent, expressed or implied; unauthorized activities being insufficient to impose liability upon the employer.[6]

"Goods," as used in the Fair Labor Standards Act, "does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." 29 U. S. C. A. § 203 (i).

The application of the Act depends on the duties of the employees rather than the nature of the employer's business.[7]

A building contractor is the "ultimate consumer" of building materials obtained from outside the state rather than a "producer, manufacturer or processor" thereof.[8] It is well settled that employees engaged in original construction are not within the Act even though the building or facility will be used for purposes within the Act upon completion.[9]

Reed v. Murphey (5 Cir.), 168 F. 2d 257, 259-261, involved employees working under two World War II cost-plus-a-fixed-fee contracts. One of the contracts was for the construction of a Navy camp and an Advance Base Depot. The second contract was for the maintenance and operation of the Advance Base Depot. Defendants maintained separate and distinct organizations. The construction contract employees were designated "construction" workers, while the maintenance and operation contract employees were known as [337] "maintenance and operation" or "M & O" employees. Approximately 40 per cent of the dollar value of construction purchase orders were issued to out-of-state vendors. The construction employees embraced guards, engineers, rodmen, firemen, timekeepers, material checkers et cetera. The M & O employees maintained and operated the Naval Advance Depot where materials and equipment were received from all parts of the United States for storage, assembly,

---

[6]Fox v. Summit King Mines, Ltd. (9 Cir.), 143 F. 2d 926, 932, affirming (Nev.), 48 F. Supp. 952; Bohn v. B. & B. Ice & C. Co. (D. C. Ky.), 63 F. Supp. 1020, 1023; Mortenson v. Western L. & T. Co. (S. D. Ia.), 42 F. Supp. 319, 321; Perlman v. Skolnick Bldg. Corp. (Me.), 39 A. 2d 186, 187.

[7]Martino v. Michigan Window Cleaning Co., 327 U. S. 173, 177, 66 S. Ct. 379, 90 L. Ed. 603; Overstreet v. Northshore Corp., 318 U. S. 125, 132, 63 S. Ct. 494, 87 L. Ed. 656.

[8]Barbe v. Cummins Const. Corp. (D. C. Md.), 49 F. Supp. 168, affirmed 138 F. 2d 667, among others.

[9]McDaniel v. Brown & Root, Inc. (10 Cir.), 172 F. 2d 466, 471[1]. See also Cooper v. Rust Eng. Co. (D. C. Ky.), 84 F. Supp. 149 (6 Cir.), 181 F. 2d 107, opinion, petition for rehearing, 9 W. H. cases 506, 6 C. C. H. Labor cases, p. 78166, No. 65,952, certiorari denied, 340 U. S. 879, 71 S. Ct. 116, 95 L. Ed. —; Scholl v. McWilliams Dredg. Co. (2 Cir.), 169 F. 2d 729, 731[3-5]; Noonan v. Fruco Const. Co. (8 Cir.), 140 F. 2d 633, 634, 635; Parham v. Austin Co. (5 Cir.), 158 F. 2d 566, 567; Collins v. Ford, Bacon & Davis, Inc., 66 F. Supp. 424, 425[1]; Damon v. Ford, Bacon & Davis, Inc. (E. D. Pa.), 62 F. Supp. 446, 448; Adams v. Long, 239 Mo. App. 1227, 202 S. W. 2d 112, 123; Annotation, 8 A. L. R. 2d 744, 747.

and reshipment to "Seabee" Construction Battalions; and they also assembled, fabricated and prepared materials for shipment to Advance Bases in various war theaters. The District Court held 117 of the plaintiffs were entitled to recover, 89 of them were construction contract employees, 21 were construction contract employees part of the time and part of the time they were M & O employees, and 7 were M & O employees throughout. The Court of Appeals reversed this judgment; but the United States Supreme Court in granting certiorari (Nov. 15, 1948, 335 U. S. 865, 69 S. Ct. 105, 93 L. Ed. 401) said: "The petition for writ of certiorari is granted. The judgments below are vacated and the case remanded to the District Court with instructions to dismiss those causes of action involving solely construction work, and to reconsider the remaining causes of action in the light of the decision of this Court in Kennedy v. Silas Mason Co., 334 U. S. 249, 92 L. Ed. 1349, 68 S. Ct. 1031." The Kennedy case involved employees "in a Government-owned plant in which respondents produced munitions under a cost-plus-fixed-fee contract," and did not involve original construction.

■ *Expansion.* Plaintiffs claim that each and every plaintiff is within the Act for the reason all plaintiffs were engaged in activities constituting an expansion of the existing facilities of United Aircraft Corporation in East Hartford, Connecticut, a corporation engaged in the production of goods for interstate commerce; and that the trial court erred in refusing plaintiffs' requested findings of fact and conclusions of law to that effect.

Walling v. McCrady Const. Co. (3 Cir.), 156 F. 2d 932 (affirming 60 F. Supp. 243), stressed by plaintiffs on the issue, involved contracts for the maintenance, repair, and reconstruction of public highways, telephone facilities, railroad facilities (all used in interstate commerce—l. c. 933, 934), and the construction of industrial plant facilities for industries engaged in commerce "to enlarge or replace outmoded buildings and machinery, and thus to continue the operation of the plant as a whole" (l. c. 934, 937). That is not the instant situation.

Plaintiffs' contention runs counter to the written contracts herein mentioned, to the operation of the plant by Pratt & Whitney as agent for the Government, without profit to Pratt & Whitney or United; and to the purchase and ownership of the site, construction equipment et cetera, completed plant, machinery, and materials by the Defense Plant Corporation, the Government. The original construction by Long-Turner of the instant airplane plant for the Government constituted in no sense the repair, replacement, or maintenance of facilities in existence at East Hartford, Connecticut, more than 1000 miles from the site of construction.

The distinction is pointed out by the Kansas City Court of Appeals in a case against Long-Turner, viz.: Adams v. Long et al., 239 Mo.

App. 1227, 202 S. W. 2d 112, 123, and also by the author of Walling v. McCrady Const. Co., supra, in the later case of Kelly v. Ford, Bacon & Davis, Inc. (3 Cir.), 162 F. 2d 555, 557[2], under facts similar to those involved in the instant case. Further, Scholl v. McWilliams Dredg. Co. (2 Cir.), 169 F. 2d 729, 731, states Walling v. McCrady Const. Co., supra; Walling v. Patton-Tulley Transp. Co. (6 Cir.), 134 F. 2d 944, and Ritch v. Puget Sound Br. & Dredg. Co. (9 Cir.), 156 F. 2d 334, all cited by plaintiffs to points herein, are of doubtful authority in view of later holdings.

█ *Firemen, guards, waterboys, and nurse.* Many firemen and guards were employed in the construction work. Wooden forms were used for the concrete work. The forms were covered with tarpaulins after [338] the concrete was poured, and eight or ten coke burning salamanders were used for each form in drying the concrete. A fireman was usually stationed at each of the 59 forms. Other firemen would patrol an area assigned to them, and others were stationed at the enginehouse, ready on call to fight fires. Firemen patrolled the entire plant area, including the warehouse area where supplies were stored and boxcars were on sidings, also the lumber yard where some outstate lumber was stored.

Most guards were given a post (a beat), but there were also some roving guards. Outside guards watched the traffic to see that only authorized persons entered or left the area. Truckers would have manifests of goods for Long-Turner or a "pass-out" slip issued by the foreman of warehouses. The guards also directed traffic and protected property in the area, including the boxcars to see that nothing happened to them. The construction machinery was consigned to Defense Plant Corporation and manufacturing machinery was consigned to Pratt & Whitney not Long-Turner.

Construction work progressed from the west towards the east on the main building. Around the first part of February, 1943, after portions of the building were completed they were released to Pratt & Whitney to install manufacturing machinery. The machines first started operating in May or June, 1943.

Pratt & Whitney established a fire department in February, 1943, and in March they employed guards. They constructed wooden partitions around the space released to it and Long-Turner's guards and firemen were moved back and had no jurisdiction thereover. The guards of both Pratt & Whitney and Long-Turner worked together on the outside gates for a short time, then Pratt & Whitney guards took over the outside assignments and Long-Turner guards covered the inside area so far as construction work was involved. At first Pratt & Whitney's fire department did not have adequate equipment, and from February until July, 1943, the two fire services overlapped. There was evidence that both departments covered a fire in a transformer on a pole, and also an alarm where lumber in a boxcar sus-

tained $15 damage. Long-Turner discontinued its fire department in July, 1943, turning it over to Pratt & Whitney.

*Prior to February 1, 1943.* Plaintiffs claim that up to February 1, 1943, when Pratt & Whitney manufacturing machinery began to arrive for installation, their firemen and guards were within the Act because their activities were so closely related to incoming interstate shipments as to be a part thereof. Plaintiffs stress Ritch v. Puget Sound Br. & Dredg. Co., 156 F. 2d 334, 337[4]; and cite· Tagler v. F. D. Carpenter Coal Co., 57 F. Supp. 314[1], and West Kentucky Coal Co. v. Walling, 153 F. 2d 582, 584.

The Ritch case (l. c. 335) involved a ''deepening'' and ''improvement'' of existing ''essential instrumentalities of interstate commerce,'' and draftsmen and timekeepers were considered as much within the Act as actual construction workers. The employees in the coal yards involved in the Tagler and in the West Kentucky Coal Company cases assisted or were transferred by their employer when needed to assist in unloading interstate shipments of coal et cetera.

Plaintiffs' cases are distinguishable and do not establish error. In the instant case the Defense Plant Corporation, the Government, held title to the materials, supplies, and equipment used in the construction of·the plant, as well as all work completed or in the course of completion at the plant. Long-Turner were engaged in original construction work and were the ultimate consumer of the materials used. ·The evidence did not establish that the guards and firemen or any guard or fireman devoted a substantial portion of any given workweek to services within the Act. The record sustains the trial court. Consult Reed v. Murphey (5 Cir.), 168 F. 2d 257, 260; Cooper v. Rust Eng. Co. (W. D. Ky.), 84 F. Supp. 149, 150; Parham v. Austin Co. (5 Cir.), 158 F. 2d 566, 567.

*After February 1, 1943.* Plaintiffs claim that after February 1, 1943, their firemen, guards, waterboys, and nurse were [339] within the Act because after said date their activities affected and made possible the production of goods for interstate commerce by Pratt & Whitney as well as the production of goods for commerce by Long-Turner.

Plaintiffs stress the facts that manufacturing machinery began to arrive the first part of February, 1943, for installation in sections of the building released to Pratt & Whitney; that the first engine part was manufactured about May 1, 1943; that the manufacture of parts interchangeable with parts manufactured by United started about August 15, 1943, and that the first engine was tested in October and was delivered in December, 1943. They cited Roland El. Co. v. Walling, 326 U. S. 657, 662, 663, 66 S. Ct. 413, 90 L. Ed. 383; Spaeth v. Washington University, 240 Mo. App. 79, 213 S. W. 2d 276, 279[2, 3]; Warren-Bradshaw Drilling Co v. Hall, 317 U. S. 88, 91, 63 S. Ct.

125, 87 L. Ed. 83; E. C. Schroeder Co. v. Clifton (10 Cir.), 153 F. 2d 385, 390.

A substantial portion of the workweek of the Roland El. Co. employees was devoted to the repair and reconstruction of electrical motors or other electrical work for customers, producing goods for interstate commerce, of their employer, which service was the foundation of the employer's business; and the Roland El. Co. was held not to be a "service establishment" within 29 U. S. C. A. § 213(a, 2)..

In the Spaeth case the employee's duties were to watch over the "Cupples Station Property," buildings housing property of tenants engaged in interstate commerce and the production of goods for commerce and railroad cars used in interstate commerce.

The Warren-Bradshaw Drilling Co. case involved the drilling of an oil well, stopping short of the oil sand stratum. The court considered that oil is obtained only by drilling; that drilling was a necessary and immediately related part of the productive processes, and employees thus engaged were producing goods for commerce.

The E. C. Schroeder Co. case considered employees mining, producing and processing the gravel cushion and riprap for the construction of a dyke to prevent the flooding of an existing oilfield by a dam under construction and to maintain the continuous movement of the oil in interstate commerce to be tied immediately to the production of the oil for commerce.

The services rendered by plaintiffs were essential to the original construction work of Long-Turner, a local transaction; but they were not established by the evidence to be the foundation of or to have such a close and immediate tie with the production of goods for commerce by Pratt & Whitney as to be an essential part of it. The reasoning applied in the oil well cases has not been applied to new construction of buildings and facilities erected upon a given space and which, of course, do not constitute "goods." Plaintiffs were employed to aid the new construction work and were stationed at different places on the 400 acre site. As Pratt & Whitney took over released sections of the manufacturing building, Long-Turner employees were excluded and plaintiff-firemen and guards ceased to have jurisdiction over that space. Pratt & Whitney guards worked at the outside gates with Long-Turner guards for a short time, but the Long-Turner guards were soon transferred to cover the inside area for construction work. The cooperation between the fire departments called to our attention was the answering of fire calls in a transformer on a pole and a fire causing $15 damage to lumber in a boxcar. The firemen were those at the two fire stations. Firemen guarding the salamanders were not involved.

The nurse testified that she treated Pratt & Whitney employees on occasions when they came to her for aid before the Pratt & Whitney infirmary was opened.

The waterboys, while on their posts for Long-Turner, would supply water to anyone who asked for it, including Pratt & Whitney employees if they requested a drink.

Some testimony must have taxed the credulity of the trial court. The credibility of the witnesses is a factor.

Furthermore, the evidence does not establish that any specific fireman, guard, waterboy, [340] or the nurse engaged in the production of goods for commerce for any substantial period of any given workweek; and it is impossible to say that any plaintiff performed such work within any given workweek and, if so, whether he worked in excess of forty hours that particular week. We do not find sufficient evidence for overturning the court's refusal of plaintiffs' findings of fact and conclusions of law in this respect.

Remote and inconsequential transactions involving commerce do not change the fundamental nature of new construction, the rule of de minimus applying. Hunter v. Madison Avenue Corp. (6 Cir.), 174 F. 2d 164, 167[2]; Cooper v. Rust Eng. Co. (D. C. Ky.), 84 F. Supp. 149, 155.

*Shipment of equipment after use.* Plaintiffs also say that Long-Turner employees after March 1, 1943, cleaned, repaired, loaded, and shipped construction machinery to points outstate, and that such action constituted the production of goods for commerce; citing Clyde v. Broderick (10 Cir.), 144 F. 2d 348, 350, 351, and Engebretsen v. E. J. Albrecht Co. (7 Cir.), 150 F. 2d 602. The cases are distinguishable.

Clyde v. Broderick was up on plaintiff's petition, which alleged that Clyde and others unloaded the tools and equipment when received in interstate commerce and when they were no longer needed prepared and loaded them for interstate shipment. No plaintiff involved here loaded or unloaded supplies, materials or equipment. We understand the employees performing such services were paid under the Act. Cooper v. Rust Eng. Co. (D. C. Ky.), 84 F. Supp. 149, 152, states Clyde v. Broderick is out of line with later cases. The defendant in the Engebretsen case maintained and repaired dams, viaducts on highways and river improvements, instrumentalities of commerce; and the services of plaintiff as a guard at defendant's headquarters, embracing guarding stored equipment pending use, were held an essential part of defendant's business. Long-Turner were engaged in new construction and not the repair or maintenance of existing instrumentalities devoted to interstate commerce.

We mention here an alleged error for not considering evidence of the shipment of wooden forms (movable, known as "traveling forms") used in the concrete construction. The evidence was admitted. Other evidence established that these forms were used many times; that after use they were good only for salvage, and that Defense Plant Corporation, not Long-Turner, sold some of the salvage to farmers.

Plaintiffs' cases do not establish error. A finding that the "traveling forms" were not shipped outstate is within the record. Individual plaintiffs were not shown to have prepared construction equipment for shipment or to have devoted a substantial portion of any given workweek to services in connection with such shipments.

■ *Intermingling of operations.* Plaintiffs say "the whole building operation was so intermingled and scrambled as to bring plaintiffs within the Act for the reason that the building operation was part of one large integrated effort to the production of goods for commerce." We do not agree. The contention ignores cases holding new construction is local and not within the Act. The findings of the trial court refute plaintiffs' contention and are well sustained by the evidence adduced. Cases wherein the employer is engaged in interstate commerce or in the production of goods for interstate commerce (Armour & Co. v. Wantock, 323 U. S. 126, 65 S. Ct. 165, 89 L. Ed. 118; Alberts v. Porter (D. C. Ill.), 10 Labor cases 62,809) differ on the facts. The "goods" were not in the possession of the ultimate consumer, as here, but were being processed for shipment in interstate commerce to the consumer. They do not establish error.

The holdings on this issue and on the issue relating to "Expansion," supra, adversely dispose of the vast majority of the plaintiffs' claims so far as they are developed in this record.

■ *The Surveyors.* The surveyors performed engineering work (establishing lines, grades, elevations et cetera) connected with the construction of the buildings, roads, sidewalks, parking spaces, fences, [341] spur or switch tracks, utilities et cetera. They were organized into eight to twelve surveying parties, consisting of four men each—a party chief, an instrument man, and rod or chainmen. There was testimony they were pushed to keep ahead of the construction workers.

One surveying party helped locate and set transformers west of the main building and staked out a fence around them. Part of this work was after the current was on, but we find no statement as to when or how long they were so engaged.

This surveying party also worked on a culvert and fill for a streetcar track into the plant. The streetcar track was laid several months later by the streetcar company, not by Long-Turner.

The several switch tracks within the plant area, totaling approximately 2.06 miles, connected with the main line of the Missouri Pacific, an interstate railroad, east of the plant. The main switch track was to pass around the north end of the main building to the receiving dock on the west side of the building. It was necessary to excavate part of a cliff at the northeast part of the area to make space for this track north of the building. The evidence was that after this switch had been temporarily laid to the receiving dock, engines and freight cars used it; and thereafter the track, after the cliff was cut

farther back, was moved farther north to get it in final position. The surveying party which located this switch would relocate it along the excavation and laborers, using a bulldozer, would move 50 feet of the track at a time.

The substantial evidence is that it had not been temporarily laid until the latter part of March, 1943, or perhaps as late as May, 1943. The surveyors did not work on the switch tracks every week. There is no definite evidence when they worked on the main switch after cars moved over it or when it was placed in final position. They were unable to give any dates when they worked on it.

One witness was of opinion that about 40 per cent of his working time was on railroad spurs and switches, highways, connecting roads, power plant, the streetcar line, and cuts or fills. He did not work on them every week.

The services of the surveyors connected with the new construction of buildings, roads, docks, power and communication facilities, railroad spurs et cetera were not within the Act. See Reed v. Murphey, and other cases, notes 8, 9, supra; Brue v. J. Rich Steers, Inc. (S. D. N. Y.), 60 F. Sup. 668, 669[3]; Barbe v. Cummins Const. Co. (D. C. Md.) 49 F. Supp. 168, affirmed (4 Cir.), 138 F. 2d 667. Scholl v. McWilliams Dredg. Co. (2 Cir.), 169 F. 2d 729, 732, states: "We hold that this undertaking for the construction of the Greenland base retains until its completion the status which it had at the beginning"; that is, new construction not under the Act. The Scholl case (see discussion on "Expansion," supra), considered plaintiffs' cited cases of Walling v. Patton-Tulley Transp. Co. (6 Cir.), 134 F. 2d 944, 946, 947; and Walling v. McGrady Const. Co. (3 Cir.), 156 F. 2d 932, 934, of doubtful authority; and we have hereinbefore discussed plaintiffs' case of E. C. Schroeder Co. v. Clifton (10 Cir.) 153 F. 2d 385, 390.

However, if it be considered that some of the work on the transformers or on the main switch track occurred under circumstances that might fall within the Act, members of the surveying crew failed to give any satisfactory evidence establishing that he or they, after the transformers or the main switch had been put into use, devoted a substantial portion of any given workweek to work on the transformers or on the switch track. Any judgments in their favor under the record before us would rest in speculation and conjecture.

■ *Miscellaneous.* Plaintiffs' claim of error in the judgment against Ernest Fuqua is without merit. He did not testify. His attorney's statement that he had worked as a "fuel clerk" from October, 1942, to January, 1943, is insufficient.

We find no error in the court's refusal to find for Herbert J. Hanslip, Donald R. Woollard, Verl Woollard, James M. Williams, and L. Clark Patterson. Hanslip was a field cost clerk, checking the men in [342] the field to charge the work against a specific account. The

Woollards did not testify but there was evidence they did the same kind of work as Hanslip. Williams was an employment clerk, processing employees when they were hired and when they quit. Patterson did not testify but his attorney said he was a "cost clerk." We do not find evidence that they unloaded incoming shipments and reconditioned and loaded equipment no longer needed as stated in plaintiffs' brief.

Harold H. Schewe was a "parts clerk" in the repair garage. He maintained the parts-room inventory and issued parts to the mechanics for the repair of motor vehicles used in the original construction work.

Horace Paul, a field cost clerk, kept the record of the mixed concrete used from No. 1 concrete mixer in the construction work.

Error is not established in refusing to find that Charles E. Mosley was within the Act. He was hired as a guard and acted as guard and flagman at a highway intersection with Missouri Pacific tracks constructed for the accommodation of persons and vehicles entering and leaving the plant area until the crossing was closed, and then was stationed all over the construction area as a guard, serving between May 7 and September 1, 1943. There was evidence that outside guards checked the pedestrian and vehicular traffic entering and leaving the plant area to protect the interests of the construction contractors and the Government.

There was no reversible error connected with the reception of evidence. The record discloses that plaintiffs' counsel indicated he was in accord with the rulings of the court respecting the admission and scope of the evidence. The trial was before the court and the evidence was made a matter of record. One of plaintiffs' given findings of fact appears to be based on evidence they now claim was not considered by the court.

We have discussed plaintiffs' cited cases of Ritch v. Pudget Sound Br. & Dredg. Co., and Clyde v. Broderick, supra. The employees in Cannon v. Miller (Wash.), 155 P. 2d. 500, 503[5, 8], worked on railroad engines used in interstate commerce to keep them in service. All plaintiffs considered under "Miscellaneous" were engaged in new construction work under the evidence of record. Cases hereinbefore mentioned sustain the trial court; particularly Reed v. Murphey, supra; Adams v. Long, Cooper v. Rust Eng. Co., Damon v. Ford, Bacon & Davis, Inc., and Parham v. Austin, note 9, supra. See also Brue v. J. Rich Steers, Inc., 60 F. Supp. 668, 670[4]; Scott v. Ford, Bacon & Davis, Inc. (E. D. Pa.), 55 F. Supp. 982, 983.

We need not discuss the additional defense that plaintiffs' claims are barred by § 9 of the Portal to Portal Act of 1947.

1170

The judgment of the trial court is supported by the record made. It should be affirmed. It is so ordered. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:— The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.