854

James P. MITCHELL, Secretary of Labor, U. S. Department of Labor, Plaintiff,

v.

HODGES CONTRACTING COMPANY, a corporation, and Kenneth B. Hodges, President, and as an individual, Defendants.

Civ. A. No. 445.

United States District Court M. D. Georgia, Albany Division.

Dec. 15, 1955.

Norman H. Winston, Sanford H. Palmer, U. S. Dept. of Labor, Birmingham, Ala., for plaintiff.

H. H. Perry, Jr., Peacock, Perry, Kelley & Walters, George W. Smoak, Albany, Ga., for defendants.

DAVIS, Chief Judge.

This is an action by the Secretary of Labor seeking to enjoin Hodges Contracting Company, a corporation, and Kenneth B. Hodges, from violating the overtime and record-keeping provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. The case was tried to the Court without a jury.

The defendants are engaged in the general contracting business in Albany, Georgia, and the Court has jurisdiction of the parties and subject matter.

During the period of time covered by the investigation, which served as a basis for this action, the defendants completed approximately one thousand construction projects. The plaintiff contends that five of these projects were within the coverage of the Fair Labor Standards Act and alleges violations of the overtime and record-keeping provisions of the Act with reference to these projects. The defendants deny, and have denied, that these projects are within the purview of the Act and admit that they have not complied with the provisions of that Act, deeming it inapplicable. Determination of the question of coverage will, therefore, be determinative of the question of violations.

A consideration of the close and complex questions here involved require a review of the nature of the five aforementioned construction projects and the circumstances surrounding them.

### Coats & Clark Contract.

The first of these projects was the construction of a sawmill building for the Coats & Clark Thread Mill at Albany, Georgia. It is admitted that the thread produced by Coats & Clark is sold throughout the United States and travels extensively in interstate commerce. This thread is sold on spools made at its Albany plant. For a number of years prior to this construction, Coats and Clark had operated a sawmill on its plant site for the production of spools. Some time prior to April 10, 1952, the defendant Company contracted to erect a new building to house the sawmill equipment of the Coats & Clark Company. This was not an extension of nor an addition to any existing building. Construction commenced on April 10, 1952 and was completed on February 26, 1953, but it was not used for production of spools or other goods until September 14, 1954. It was stipulated that between October 1, 1952 and February 26, 1953, some of defendant Company's employees on this project worked overtime without receiving overtime compensation, as provided by the Act.

It is contended by the defendants that this project constituted new construction and that it was not covered, even though built for the ultimate purpose of producing goods for interstate commerce. While the principle upon which they rely is a sound one, Parham v. Austin Co., 5 Cir., 1946, 158 F.2d 566, the evidence in this case does not bring this project within the definition of "new construction", as defined in recent decisions. While the building itself was new, the facility was not. The existing sawmill was used in the production of goods for commerce. The new building was constructed in order to replace or expand an existing building, and thus to continue and improve the operation of

the plant as a whole. As such, the work on the new sawmill building was within the coverage of the Act. Walling v. McCrady Const. Co., 3 Cir., 1946, 156 F.2d 932; Mitchell v. C. W. Vollmer & Co., Inc., 1955, 349 U.S. 427, 75 S.Ct. 860.

### WALB–TV and Radio Station Contract.

In February, 1954 the defendant Company entered into a contract for the construction of a new building to house the WALB TV and Radio stations. Prior to this time the radio station had been operating in other quarters approximately one mile from the site of the new building and had been engaged in interstate commerce. The company operating the station obtained a TV franchise and desired to construct new quarters to house it. The defendant Company commenced construction in February 1954, and completed the building on June 10, 1954. The television station went into operation as a facility of interstate commerce on or about September 1, 1954. The radio operations were not moved to the new building until January 1, 1955.

■ It appears that the plaintiff originally took the position that this project was covered from the date of commencement of the television operations on September 1, 1954. Now, under the ruling in Mitchell v. C. W. Vollmer & Co., Inc., supra, he is apparently contending that the project came within the Act from its commencement. The Court concludes from the facts and the applicable decisions that this project was not within the coverage of the Act at any time.

■ As contended by the defendants, this was new construction of a new facility of interstate commerce. While it is true that a portion of the building was used to house the radio station, which was a previously existing facility of commerce, the real purpose of the construction was to provide quarters for a new facility of commerce. The inclusion of the radio station seems to have been merely incidental to the construction of the television facilities. While the building did replace the previous home of the radio station, that does not appear to have been the purpose of the construction. New construction comes within the coverage of the Act where it expands or replaces an existing facility, but this would seem to be limited to situations where the purpose of the construction was to expand or replace or improve old facilities.

There is no evidence that the building in which the radio station was previously housed was in anywise unsatisfactory or outmoded. It does not even appear that the new structure was more suitable. The Court cannot close its eyes to the great advances in the field of television and must conclude that this construction was not undertaken to expand, replace or improve the radio operation but, to the contrary, may be the first step in the elimination of that type of facility of commerce. The Court concludes that Mitchell v. C. W. Vollmer & Co., Inc., supra, was not intended to apply to this type of construction.

■ The plaintiff's contention that, if not originally covered, the work done after commencement of television activities in the building would come within the Act is also without merit. As stated in Scholl v. McWilliams Dredging Co., 2 Cir., 169 F.2d 729, the construction retains until its completion the status which it had at the beginning. To hold otherwise would be to make coverage contingent upon the use of part of the uncompleted building and dependent upon an uncertain test not supported by the authorities. The increased confusion and resulting harassment to companies submitting bids for construction projects would far outweigh any advantages of such a tenuous rule. It is, therefore, concluded that the WALB–TV and Radio construction project was not within the coverage of the Act.

### Karagheusian Company, Contract No. 1.

The Karagheusian Company, a manufacturer of carpeting, purchased a tract of land in Albany, Georgia, in order to

locate a new plant there. Situated upon the land was a building previously used by another manufacturing concern. In October, 1952, the defendant Company entered into a contract with Karagheusian Company for construction of a building to be attached to the building previously existing on the property. Construction commenced in November, 1952, and was completed in the week ending October 22, 1953. The Karagheusian Company began the manufacture of carpeting in the building on August 1, 1953.

■ The plaintiff contends that work under this contract, after the date of commencement of manufacturing operations, was covered by the Wage and Hour provisions of the Act. From the date it commenced its operations the Karagheusian Company was engaged in interstate commerce. Prior to August 1, 1953 there were no operations in the building, in commerce or otherwise. Work done prior to that date was clearly new construction and not enlargement of an existing facility of commerce. Thus, it was not covered. The plaintiff's contentions as to coverage after the commencement of operations in commerce is controlled by what was said concerning WALB–TV and Radio stations after the TV operations commenced. Judge Hand's sound conclusion that the construction retains the same status until completion is again controlling. Scholl v. McWilliams Dredging Co., supra.

The defendant Company did fail to compensate its employees for overtime provided by the Act after August 1, 1953, but the Court concludes that this was not a violation of the Act, it not being applicable.

### Karagheusian Company, Contract No. 2.

■ In the week ending October 22, 1953, the Defendant Company commenced work upon a second contract with Karagheusian Company. This contract, which was completed in the week ending April 1, 1954, called for construction of a building referred to as the north addition. This building was attached to the north end of the building originally situated upon the property. The original wall of the old building was left intact but communicating doors were cut in the wall from the old into the new building. The north addition was first used as a warehouse for the storage of rugs produced at the plant prior to shipping them in interstate commerce. The addition has since been used in the actual manufacture of rugs. During the construction of this addition some employees of the Defendant Company worked overtime for which they did not receive overtime compensation provided for in the Act.

The Court concludes that the construction performed under this contract comes within the coverage of the Act and the failure to pay overtime constitutes a violation of the Act. This construction was an expansion or enlargement of an existing facility of commerce and was so closely connected to the operation as a whole that its construction is engaging in interstate commerce, as that term is used in the Fair Labor Standards Act. Walling v. McCrady Const. Co., supra.

### Karagheusian Company, Contract No. 3.

■ Work on a third contract with the Karagheusian Company was commenced by the defendant Company during the week ending September 30, 1954 and completed during the week ending February 3, 1955. This contract called for the extension of the dye-house building, which was the building originally constructed on the property. This construction was in process at the time of the investigation of defendant Company's operations. The investigator took the position that the project was covered by the Act. In accordance with this, and advice from the labor consultant employed by the defendants, the defendant Company began paying overtime in connection with the performance of this contract.

This project is covered by what was said concerning the Karagheusian Contract No. 2 and is clearly covered by the

Act. In the early days of this project, the defendant Company failed to properly compensate some employees who worked on this project. This constitutes a violation.

It is admitted that there were some minor record-keeping violations in connection with the projects covered by the Act. These were too minor to be noted, except to say that the defendants have violated the record-keeping provisions of the Act.

The defendant Company was investigated by an investigator of the Wage and Hour and Public Contracts Divisions of the United States Department of Labor during February, 1949. This investigation was conducted by Mr. George W. Smoak, who was employed as an investigator at that time. Shortly thereafter, Mr. Smoak left the Government employ and became a labor consultant. Since 1950 he has been employed as labor consultant or counsel by the defendants, who have relied upon his advice as to what projects were covered by the Act.

In 1949, defendant Company was notified by Mr. Joseph C. Noah, Regional Director of the Wage and Hour and Public Contracts Divisions, that the Company had been guilty of violations of the Act and that they should comply in the future. There is no evidence, however, showing any past violations, the letter being merely the conclusion of the writer.

Mr. Smoak is a reputable member of the Bar of Georgia and has had lengthy experience with the Wage and Hour provisions of the Act. He is a labor consultant of unquestioned reputation. At the time of the previous investigation, he advised the defendants that they were subject to the Act and were violating it, whereupon they agreed to comply in the future. Mr. Smoak testified, with respect to the projects involved here, that he advised the defendants that they were not subject to the Act. He maintained that this was his best considered legal opinion until the time he advised the defendants to comply. He testified that the defendants had been in compliance since October, 1954, with respect to any

projects similar to these here involved. He based his change in opinion on recent decisions extending the scope of the Act.

■ In view of all the facts and circumstances of this case, the Court concludes that there is no cause for an injunction to issue against these defendants. An injunction is issued, not to punish past violations, but to insure future compliance. This Court finds that there is no present danger of the defendants failing to comply with the Act as interpreted by the courts. The defendants have over a period of years employed labor counsel to aid them in avoiding entanglements such as this, and it appears that they came into compliance prior to the filing of this action. They have acted on the advice of competent counsel on matters which are so complex and confusing as to have perplexed many courts. They had a bona fide dispute with the plaintiff as to coverage and should not be penalized because this Court finds them to have been in error as to three of the five projects here involved.

This is a nebulous field of law and the Administrator is constantly seeking to extend the coverage of the Act. Until the decision by the U. S. Supreme Court in Mitchell v. C. W. Vollmer & Co., Inc., supra, it is doubtful whether any of these projects would have been held to be within the coverage of the Act. The mere fact that the defendants and their counsel guessed wrong as to the interpretation of this Act does not reflect any bad faith on defendants' part. The decision in the Vollmer case was itself a 6–2 decision. This reflects the sincere good faith dispute which existed on this question.

The plaintiff bases its contention that an injunction is necessary mainly on the defendants' failure to comply when notified by the Administrator that they were in violation. This, however, was merely a statement of opinion, official though it be, and the defendants' continued failure to comply does not indicate bad faith. This Court finds that the

defendants' past violations resulted from an honest misinterpretation of the Act, advice of counsel, and the conflicting decisions under the Act. The small number of violations, considering the size of defendants' business, is further evidence of their good faith. While the de minimis rule is inapplicable on the question of coverage, the small number of violations is relevant when considering whether an injunction shall issue.

The Court finds that there is no necessity for an injunction to deter future violations of the Act.

The foregoing shall constitute the findings of fact and conclusions of law of the Court.

Relief denied.