**James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**Carl TUNE, Individually and d/b/a Tune Construction Company, Defendant.**

**No. 1494.**

United States District Court
W. D. Arkansas.
Ft. Smith, Division.
Nov. 4, 1959.

T. Hagan Allin, Trial Atty., U. S. Dept. of Labor, Dallas, Tex., for plaintiff.

Dickson, Putman & Millwee, Fayetteville, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

This action was brought by the Secretary of Labor pursuant to Sec. 17 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 217, to enjoin future violations by the defendant of the overtime provisions of Sec. 7 of the Act, 29 U.S.C.A. § 207.

The defendant is a general contractor, and the specific violation alleged in the complaint concerns the construction of a new factory building for the Baldwin Piano Company at Fayetteville, Arkansas. The defendant denies in his answer that the construction of this new production and manufacturing facility at Fayetteville is covered by the Fair Labor Standards Act.

The case was tried to the court on August 18, 1959, and was submitted and taken under advisement. Counsel for the parties were requested to submit briefs in support of their respective contentions. The briefs of the parties have

been received and have been considered along with the pleadings, testimony, stipulations and exhibits. The court now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## Findings of Fact

**1.**

The plaintiff is the Secretary of Labor, United States Department of Labor. The defendant is a citizen of Arkansas and a resident of the Western District of Arkansas, Fayetteville Division, and is doing business under the name of Tune Construction Company.

**2.**

The Baldwin Piano Company of Cincinnati, Ohio, has for more than ten years past been engaged in the manufacture and production of electronic organs at its Cincinnati, Ohio, manufacturing plant. The electronic organs produced by the Baldwin Piano Company are sold and distributed through Baldwin dealers and representatives in some 250 localities throughout the United States.

Prior to 1958 the price range for Baldwin electronic organs was between $1,800 and $8,000. In the production and sale of the organs, the Baldwin Piano Company is competitive with other leading manufacturers of similar products, and competes on a consumer market with other leading manufacturers of similar products.

For the purpose of enhancing its competitive position on the consumer market, the Baldwin Piano Company planned and engineered a completely new Model 30 electronic organ designed to sell for approximately $900, or almost half the price of its previous lowest priced model. The Model 30 organ utilizes the basic Baldwin patented concepts, but it is more compact and has many structural, mechanical and design differences from the other Baldwin organs.

Due to the favorable labor market and other advantages, the Baldwin Company decided to build a new factory for the production of Model 30 organs at Fayetteville, Arkansas.

**3.**

The defendant, Carl Tune, d/b/a Tune Construction Company, is a general contractor, and since 1948 has been engaged in all types of construction activities, including residential, commercial and industrial buildings, plants and facilities. He employs approximately 72 men and expects to continue in the business of a general contractor in the future.

**4.**

On May 14, 1958, the Baldwin Piano Company entered into a contract with the defendant for the preparation of a building site on which its new plant would be located. The company entered into this separate site preparation contract because it was anxious for work to begin, and because there were various details of the design of the plant buildings still to be worked out. On August 1, 1958, the contract covering the actual construction of the buildings was signed. The work on both contracts went on simultaneously and concurrently. The defendant used the same employees on each contract and treated the separate phases as one project. Construction was completed on April 15, 1959.

**5.**

On May 22, 1958, the Baldwin Company leased space at the Washington County Fairground, located in Fayetteville, for the purpose of enlisting and training local personnel to produce the new Model 30 electronic organ. The plan was to train the new personnel and to move them into the new plant upon its completion.

The Baldwin Company transferred four technical employees and a manager from its Cincinnati plant to Fayetteville for the purpose of recruiting and training new employees. Six young engineering graduates from the University of Arkansas were hired and trained, and they, together with the transferred employees, trained the personnel who would constitute the regular work force.

Between May 22, 1958, and April 15, 1959, the Baldwin Piano Company pro-

duced between 1,750 and 2,000 completed Model 30 electronic organs at the Fairground facility as an incident to the training of the newly hired personnel. A substantial portion of these organs were sold and delivered to Baldwin Piano Company dealers located outside the State of Arkansas. The first organ manufactured for sale at the Fairground facility was completed on August 15, 1958.

6.

On October 6, 1958, James D. Walpole, an investigator for the Wage and Hour Division of the U. S. Department of Labor, commenced an investigation of the defendant's operation for the purpose of determining whether the defendant was in compliance with the provisions of the Fair Labor Standards Act. During the course of such investigation, Walpole examined the defendant's records and interviewed employees. On the basis of this investigation Walpole determined that 23 violations had occurred and that back wages in the amount of $590.99 were due employees. The defendant made such payments without protest. The $590.99 due employees covered a two-year period of the operations on various projects of the Tune Construction Company, in which it did a gross business of two million dollars and had a payroll of over $400,000.

During the course of the investigation the question of coverage on the Baldwin project was raised by Walpole. At that time he advised the defendant that he thought the project was covered. Final notification of the Labor Department's position, in the form of a letter from the Regional Director of the Wage and Hour Division, was not received by the defendant until December 31, 1958. By that time two-thirds of the overtime work on the Baldwin project had been completed. The defendant's attorney advised him that the construction was not covered, and the project was completed without paying the overtime wage rate provided in the Act.

The Fayetteville plant of the Baldwin Piano Company is now in full operation. It employs 175 to 200 persons and produces fifty Model 30 organs per day. Subsequent to the opening of the plant in April 1959, Baldwin had started producing a more expensive organ at the Fayetteville plant along with the Model 30. The majority of the organs produced are sold in interstate commerce through established Baldwin dealers.

The central offices of the Baldwin Piano Company are in Cincinnati, and the operation of the Fayetteville plant is directed from there. The Cincinnati plant of Baldwin continues to produce the higher priced Baldwin electronic organs.

Discussion

The Secretary of Labor alleged in his complaint that the employees of the defendant were engaged in the production of goods for interstate commerce while working on the construction of the Fayetteville plant of the Baldwin Piano Company.

An examination of the Fair Labor Standards Act discloses that in the original Act of 1938, the term "produced" was defined as:

" 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State." Fair Labor Standards Act of 1938, § 3(j), 29 U.S.C.A. § 203 (j).

In applying this definition to new construction projects, the Department of Labor, Wage and Hour Interpretative Bulletin No. 5, paragraph 12, dated December 2, 1938, revised November 1939, stated:

"The question arises whether the employees of builders and contrac-

tors are entitled to the benefits of the Act. The employees of local construction contractors generally are not engaged in interstate commerce and do not produce any goods which are shipped or sold across state lines. Thus, it is our opinion that employees engaged in the original construction of buildings are not generally within the scope of the Act, even if the buildings when completed will be used to produce goods for commerce."

In 1949 Congress amended Section 3 (j) of the Fair Labor Standards Act to read:

" 'Produced' means produced, manufactured, mined, handled, or any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State." Act of October 26, 1949, 29 U.S.C.A. § 203(j).

In commenting on this change, the Court of Appeals for the Fifth Circuit said in H. B. Zachry Company v. Mitchell, 1959, 262 F.2d 546, at page 550:

"In connection with this language it must be further recognized that the amendment of 1949 made even more restrictive the definition of production of goods for commerce by changing the word 'necessary' to the term 'directly essential,' and by adding also the words 'closely related' to modify the word 'occupation.' Reference need not be made to Committee reports or other aids by way of legislative history for the court to draw the conclusion that the intent of Congress in the enactment of such amendments was to add to rather than detract from the class of employees to be considered engaged in local enterprises."

Despite the more restrictive scope of Section 3(j) of the Act, coverage as applied to new construction projects remained fairly constant until the celebrated 1955 case of Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 861, 99 L.Ed. 1196. The Vollmer case held that employees engaged in the construction of a lock and canal which will form part of the Gulf Intracoastal Waterway, and which was designated as an alternate route to an inadequate existing lock and canal, are "engaged in commerce" and are thereby covered by the Fair Labor Standards Act.

Following the Vollmer decision, the Administrator issued a new interpretative regulation extending the coverage of the Act as to new construction.[1] It

1. Title 29, C.F.R., Sec. 776.26, reads as follows:
"Unless the construction work is physically or functionally integrated or closely identified with an existing covered facility it is not regarded as covered construction because it is not closely enough related to or integrated with the production of goods for commerce or the engagement in commerce. For this reason the erection, maintenance or repair of dwellings, apartments, hotels, churches and schools are not covered projects. Similarly the construction of a separate, wholly new, factory building, not constructed as an integral part or as an improvement of an existing covered production plant, is not covered (Cf. Sec.

776.27(c)). Coverage of any construction work, whether new or repair work, depends upon how closely integrated it is with, and how essential it is to the functioning of, existing covered facilities. Neither the mere fact that the construction is 'new construction' nor the fact that it is physically separated from an existing covered plant, is determinative. Moreover, the court decisions make it clear that the construction project itself need not be actually employed in commerce or in the production of goods for commerce during the time of its construction in order to be covered. Such factors may be considered in determining whether as a practical matter the work is directly and vitally related to the

should be noted, however, that the Vollmer case is concerned with employees who were "engaged in commerce" rather than "in the production of goods for commerce." The effect of the Vollmer decision on the "new construction doctrine" as applied to workers engaged in the production of goods from commerce is somewhat in doubt. The Court of Appeals for the Fifth Circuit in H. B. Zachry Company v. Mitchell said at page 551 of 262 F.2d:

"Cases which apply the 'engaged in commerce' provision of the Act are of course not applicable here. Thus we can derive little guidance in construing the definition section relating to production of goods for commerce from Alstate Construction Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745, and Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196."

However, in Chambers Construction Company v. Mitchell, 233 F.2d 717, at page 722, the Court of Appeals for the Eighth Circuit said:

"Mention is made that the Vollmer case dealt with improvements to interstate instrumentalities while the instant case is concerned with improvements to facilities transporting commodities used to produce goods for interstate commerce. While conceding the distinction, we do not consider it determinative."

It is the contention of the Secretary of Labor that the employees of the Tune Construction Company were engaged in the "production of goods for commerce" and are thereby covered by the provisions of the Fair Labor Standards Act, because they performed labor in the construction of a plant, which, it is alleged, was designed to replace, expand and enlarge already existing covered production facilities. The Secretary's argument is two-pronged: (1) that the new plant was a replacement of production facilities at the Washington County Fairground; (2) that the plant was an expansion and enlargement of already existing production facilities in Cincinnati, Ohio.

In determining cases in this field there are certain general pronouncements of the Supreme Court of the United States to serve as guide posts. It should first of all be recognized that the Fair Labor Standards Act must be given a liberal construction. Mitchell v. C. W. Vollmer & Co., supra. The second guiding factor is that the scope of the Act is not co-extensive with the power of Congress over commerce. 10 East 40th Street Building, Inc., v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806. The Supreme Court has further said that the determination of whether an employee is covered by the Fair Labor Standards Act should be made by practical considerations and not technical conceptions. Mitchell v. C. W. Vollmer & Co., supra. A final general principle is that which requires courts to undertake, if possible, to understand the purpose sought by Congress in adopting an amendment to a statute which has already been the subject of much judicial construction.

In analyzing the first prong of the Secretary's argument, that is, that the new Fayetteville plant constituted a replacement of production facilities at the Washington County Fairground, there are numerous factors to be considered.

The site preparation contract, executed between the Baldwin Piano Company and

functioning of the covered facility but would not be decisive."

Title 29, C.F.R., Sec. 776.27(c), reads as follows:

"(1) Construction of a new factory building, even though its use for interstate production upon completion may be contemplated, will not ordinarily be considered covered. However, if the new building is designed as a replacement of or an addition or an improvement to, an existing interstate production facility, its construction will be considered subject to the act.

"(2) If the new building, though not physically attached to an existing plant which produces goods for commerce, is designed to be an integral part of the improved, expanded or enlarged plant, the construction, like maintenance and repair, would be subject to the act."

the defendant, was signed on May 14, 1958. The lease of the Washington County Fairground as a training facility did not occur until May 22, 1958. The actual contract covering the construction of the plant building was executed on August 1, 1958, and it was not until August 15, 1958, that the first Model 30 organ produced for sale as a by-product of the Baldwin training program was completed. It should also be noted that the defendant treated the two contracts as one project throughout the construction period. On the basis of these factors the defendant contends that construction of the new Baldwin plant had already commenced before the training facility was leased and started operation and that, therefore, the well-established rule that construction work retains until completed the status it held at the beginning would control. See, Scholl v. McWilliams Dredging Co., 2 Cir., 1948, 169 F.2d 729.

In view of the circumstances which resulted in the unusual procedure of the separate .letting of the site preparation and the building construction contracts, along with the treatment by the parties of both phases and contracts as one project, the court feels there is some merit in this argument of defendant.

However, even if the training facility was in operation prior to the execution of the construction contract, a finding that the construction work was covered by the Act is not compelled. In viewing the situation from practical considerations as directed in the Vollmer case, it cannot be said that the facts warrant a finding that the new Fayetteville plant was built to replace, enlarge, or expand the training facilities at the Washington County Fairground. The Fairground facilities were designed and utilized for the training of newly employed personnel, and the production of organs was merely a by-product of this training program. Without the contemplated construction of the new plant, there would have been absolutely no requirement for the training facility.

The second prong of the Secretary's argument is more far-reaching in its implications than the first. He contends that the Fayetteville plant extended, enlarged, and improved the Cincinnati plant so as to become integrated and essential to its operation, and in effect an integral part of that existing covered facility. No cases have been cited by counsel for the plaintiff, and none have been found in which such an argument has been sustained by any court when the new plant is constructed several hundred miles from the existing covered facility. The Secretary contends, however, that such an argument is in no way novel, and that it is in line with authoritative decisions of coverage under the Act.

It should be noted, however, that the letter written by the Regional Director of the Wage and Hour Division on December 30, 1958, notifying the defendant that in his opinion the Baldwin project was covered by the Act, based coverage solely on the allegation that the new plant was a replacement or extension of the Baldwin facilities at the Washington County Fairground. No mention was made of the theory that the new Fayetteville plant was covered due to any relationship with the Cincinnati plant of the Baldwin Piano Company.

In Walling v. McCrady Construction Co., 3 Cir., 1946, 156 F.2d 932, perhaps the leading case for the "expansion of an existing covered production facility" rule, it is obvious that the construction in question there was on the same premises as the old expanded facility, and the construction was physically or functionally integrated into existing buildings and structures. In Mitchell v. Hodges Contracting Co., D.C.Ga.1955, 136 F. Supp. 854, a well-known carpet manufacturer purchased a tract of land in Albany, Georgia, in order to locate a new plant there. The construction of this new plant was held to be original and separate new construction, and apparently the Secretary did not even argue that the construction of this new plant expanded any of the carpet company's existing plants.

Section 3(j) of the Act requires that one be engaged in a .closely related proc-

ess or occupation directly essential to the production of the goods in question. A close connection is especially necessary since Congress restricted the meaning of "produced" in 1949. Even the language of the 1956 Interpretative Regulations connotes that the "expansion" rule requires that the new construction be designed to become an integral part of the improved plant.

The primary relationship shown between the Fayetteville plant and the Cincinnati plant is the fact that they are both owned by the same company and organs are manufactured in both plants. To make coverage or noncoverage of the construction of a new plant turn solely on ownership without requiring that the new plant be a replacement or an integral part of the existing covered facility would be to completely destroy the guiding principles of the Fair Labor Standards Act. If common ownership alone were the test, numerous devices could be utilized to circumvent it. It must also be remembered that in this case the Fayetteville plant was not designed to produce the same products as the Cincinnati plant, but rather was designed and built primarily, if not solely, for the purpose of producing a new and unique low-priced electronic organ. The production of Model 30 organs at the Fayetteville plant marked the Baldwin Piano Company's first venture into the low-priced organ field. This was the first small organ Baldwin ever produced, and it was designed to appeal to a completely different segment of the American public than its regular models.

Considering all the factors of the distance and relationship between the two plants along with the purpose of the new plant, it cannot be said that the Fayetteville facility is such an extension of the Cincinnati plant so as to become an integral part thereof. Absent any clear expression of the Congress to extend the definition of "production of goods for commerce" to cover such independent new construction, the court under the facts in the instant case is unwilling to so extend the coverage.

Since it is the opinion of the court that the construction of the Fayetteville, Arkansas, plant of the Baldwin Piano Company was not covered by the provisions of the Fair Labor Standards Act, it is not necessary to pass on the question of issuing an injunction. However, it is noted that even if the project had been covered, the facts show conclusively that the defendant exercised good faith throughout the controversy. As stated in Mitchell v. Hodges Contracting Co., D.C.M.D.Ga.1955, 136 F.Supp. 854, at page 858:

"This is a nebulous field of law and the Administrator is constantly seeking to extend the coverage of the Act. Until the decision by the U. S. Supreme Court in Mitchell v. C. W. Vollmer & Co., Inc., supra, it is doubtful whether any of these projects would have been held to be within the coverage of the Act. The mere fact that the defendants and their counsel guessed wrong as to the interpretation of this Act does not reflect any bad faith on defendants' part. The decision in the Vollmer case was itself a 6–2 decision. This reflects the sincere good faith dispute which existed on this question."

The facts as established by the testimony, stipulations and exhibits offer no basis for a determination that the defendant would fail to abide by the court's decision on future projects of this nature had coverage been sustained. On the contrary, the statements of the defendant and his excellent record in the past indicate a good-faith willingness to comply with the provisions of the Act.

Conclusions of Law

1.

The court has jurisdiction of the subject matter and the parties, 29 U.S.C.A. § 217.

2.

The construction of the new Baldwin Piano Company plant at Fayetteville, Arkansas, was not covered by the pro-

visions of the Fair Labor Standards Act of 1938, as amended.

3.

. The plaintiff's request for an injunction should be denied and the complaint against the defendant should be dismissed.

A judgment in accordance with the above is being entered today.