**James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**WADE LAHAR CONSTRUCTION COMPANY, a corporation, Defendant.**

**Nos. 451 and 455.**

United States District Court
W. D. Arkansas,
Harrison Division.

Jan. 6, 1960.

---

city, under provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq. Civil Action No. 451 was filed on May 5, 1959, and seeks an injunction restraining the defendant from further alleged violations of the Act. Civil Action No. 455 was filed June 3, 1959, and seeks recovery on behalf of several employees of the defendant corporation for alleged minimum wages and overtime compensation. Involved in these cases was the work performed by the defendant under a contract with the U. S. Corps of Engineers, which consisted of clearing certain areas of the reservoir formed by the Table Rock Dam project on the White River in Carroll and Boone Counties, Arkansas, and Barry, Stone and Taney Counties of Missouri.

In Civil Action No. 455 there is no dispute concerning the compensation paid and the hours worked by a majority of the defendant's employees. The records of the defendant accurately reflect the hours worked by all employees except three night watchmen who were paid on a weekly basis. The defendant did not pay his employees on the project in accordance with the Fair Labor Standards Act. Therefore, the only issue to be determined by the court is whether the employees of the defendant were engaged in interstate commerce, or in the production of goods for interstate commerce while clearing the designated areas of the Table Rock Reservoir.

The plaintiff alleges that the clearing activities of the defendant were part of the over-all construction of the Table Rock Dam and Reservoir, and therefore are subject to the Fair Labor Standards Act. The Secretary further contends that the defendant's employees were engaged "in commerce" in that (1) the purpose of the construction of the dam and reservoir was to control water levels and thereby affect the navigability of the lower White and Mississippi Rivers, (2) that flood control protection is given by the construction of the dam and reservoir to interstate highways, railroads, power lines and communication facilities.

Harry Campbell, Jr., Deputy Regional Atty., Dept. of Labor, Dallas, Tex., for plaintiff.

Mehaffy, Smith & Williams, Little Rock, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

These suits were commenced by the Secretary of Labor, in his official capa-

In response to an interrogatory, the plaintiff stated that the employees of the defendant were engaged "in the production of goods for commerce" because:

"The construction of the Table Rock Dam and Reservoir is an extension and improvement of the existing interstate power network operated under the supervision of the Southwestern Power Administration, whereby power is produced for interstate transmission as well as for use in the production of goods for interstate commerce. Further, the flood control features will protect farms and industrial areas producing goods for interstate commerce."

The defendant denies that its employees were engaged in commerce or in the production of goods for commerce within the coverage of the Fair Labor Standards Act. It further contends that the purpose of the clearing operation was only to provide suitable recreational facilities on the reservoir, and therefore was a local activity outside the coverage of the Act.

The cases were consolidated for trial and were tried to the court on September 14, 1959. At the conclusion of the trial the cases were submitted and briefs were requested from the parties in support of their respective contentions. The briefs have been received and considered by the court along with the pleadings, testimony and exhibits. Findings of fact and conclusions of law are included in this opinion which is filed in accordance with the provisions of Rule 52(a), F.R. Civ.P., 28 U.S.C.A.

The Wade Lahar Construction Company is an Arkansas corporation organized in 1952. Its home office is Mountain Home, Arkansas, and Mr. Wade Lahar is President of the company. The company is one of the largest concerns engaged in reservoir clearing and handles jobs throughout the United States. Mr. Lahar has been regularly engaged in clearing work under contract with the Corps of Engineers since 1931.

The construction and clearing of the Table Rock Dam and Reservoir, which forms the basis of the two cases now before the court, is a part of the development program of the White River Basin. The White River has its beginning in the mountains of northwest Arkansas and flows northeasterly 215 miles to the vicinity of Forsyth, Missouri. A short distance from that point it reenters Arkansas and flows southeasterly for a distance of 505 miles across the State to join the Mississippi River 45 miles upstream from Arkansas City, Arkansas. The development program of the White River has consisted of the building of various levees and dams.

House Document 917, 76th Congress, 3rd Session, is the basic authority for this development. The primary reason for the development of the White River Basin and the Table Rock Dam and Reservoir can be summarized as (1) aid to navigation on the lower White and Mississippi Rivers, (2) flood control, (3) generation of electric power, and (4) recreational purposes.

The Table Rock Dam is the third in a series of dams built on the White River and its tributaries. The Norfork Dam and Reservoir was completed in the year 1943. Bull Shoals Dam and Reservoir was completed in 1952. The Table Rock Dam was completed in 1959. Land acquisition is currently underway for the Beaver Dam, which is to be constructed near Beaver, Arkansas, upstream from the Table Rock project.

Table Rock Dam is located near Branson, Missouri, and the reservoir covers parts of Carroll and Boone Counties in Arkansas, and Barry, Stone and Taney Counties in Missouri. The entire development of the White River Basin is under the supervision of the Corps of Engineers of the U. S. Army.

There is no dispute as to the over-all purposes of the development of the White River Basin and the construction of Table Rock Dam. The purpose of the reservoir clearing performed by the defendant and its relationship to the func-

tion and operation of the Table Rock Dam is in conflict however.

When the Norfork Dam was constructed in the early 1940's, the Corps of Engineers required that all reservoir areas be cleared. When the Bull Shoals Dam and Reservoir were constructed beginning in 1947, the Corps of Engineers required only modified clearing of the reservoir. The original plans formulated by the Corps of Engineers for the Table Rock project limited the clearing operation to 15 or 16 public-use areas constituting less than 5 percent of the reservoir area. Upon learning of this plan, the citizens of the surrounding area filed numerous protests with the Government demanding more extensive clearing so as to make the lake more of a tourist attraction. A public meeting was held in the baseball park in Branson, Missouri, and was attended by area residents, representatives of nearby Chambers of Commerce, Congressmen, and Corps of Engineer officials.

There are approximately 52,000 acres in the reservoir area up to contour 936, and approximately 42,000 acres up to contour 915. Of the total number of acres approximately 40,000 were timbered acres, and as a result of the meeting and protests the defendant under its contract cleared, both complete and modified clearing, a total of 12,700 acres.

As appears above, there has been a substantial change in the Corps of Engineers' policy and planning with reference to reservoir clearing. While originally it was thought there should be complete clearing, the policy and thinking have changed in recent years. In Design Memorandum No. 12 for this project, prepared by the Little Rock District Corps of Engineers, the general factors considered in the clearing of this reservoir are stated as follows:

"Clearing of the reservoir is desirable to the extent that it aids in control of the malaria and encephalitis vectors, reduces the hazard to boating, improves fish and wildlife conditions, adds to the general appearance and recreational value of the lake, and reduces the maintenance problems caused by floatage and possible interference with the outlet works."

In Section III of the same Memorandum, the Corps of Engineers explains its selection of clearing limits:

"The data described above serves only as a general guide to selection of clearing limits for Table Rock. Clearing of the entire power drawdown storage between elevations 915 and 846 and topping of trees to elevation 846 would cost 5 to 6 million dollars. Although this would be a desirable plan which conforms to that followed at certain other projects, available data does not indicate the necessity for clearing such an extensive area. Progressively less clearing has been performed as new reservoirs have been completed in this area. At Blakely Mountain, the latest large reservoir project constructed, clearing was omitted entirely in the more isolated areas. The plans described herein for Table Rock provide for clearing only the reaches considered to be reasonably necessary from the standpoint of recreation and public use. The timber in the other reaches would be killed, resulting eventually in a large amount of drift, but lake velocities will be negligible and the drift would probably be concentrated locally by wind action where it would rot rather than float to the dam. Low pool stages during periods of drought will afford opportunity in the future to clear additional areas in the reservoir if the need should develop."

The defendant had two contracts with the Corps of Engineers on the project. Both of these contracts called for the clearing of certain areas of the reservoir. The clearing of the dam site was not performed by the defendant. A detailed proposal of the work involved on each of the contracts was submitted to the defendant and others by the Corps of Engineers along with the request for

bids. The proposal set forth the amount of work involved, the areas where the work was to be performed, the requested completion date, the predetermined wage scales to be paid, and the labor laws applicable to the contract. The labor laws listed included (1) the Davis-Bacon Act, 40 U.S.C.A. § 276a et seq., (2) the Eight-Hour Law, 40 U.S.C.A. § 321 et seq., and (3) the Copeland Act. The Fair Labor Standards Act was not mentioned. It was on the basis of this detailed proposal that the defendant submitted its bids which were subsequently accepted. The first contract was dated March 17, 1958, and work was completed August 9, 1958. The second contract was dated August 8, 1958. This was the larger contract, and was completed in December 1958 and a supplemental agreement thereto was completed April 5, 1959. The work on the project performed by the defendant consisted of clearing trees from various specified areas of the reservoir. The Table Rock Reservoir consists of a series of "pools" located between various elevations. The flood pool is between elevation 915 feet and 936 feet. Water will be in this pool only during periods of flood. The normal level of the water in the reservoir is 915 feet. The "power pool" is designated as that area between 915 feet and 874 feet.

Complete clearing of all timber was accomplished in certain areas from the elevation 915 feet to either elevation 874 or 840 feet. The clearing to elevation 840 was done only in the public-use areas. In other areas a type of modified clearing was accomplished below 874 feet or 840 feet as the case may be. In the modified-type clearing only those trees that projected above a certain elevation were removed or topped. Except in very shallow streams, most of the trees would be left remaining in areas in which modified clearing was performed. Throughout the entire reservoir the practice was to clear one side of the stream or the other with the opposite side being left uncleared, and all trees, trash and brush on the opposite side would remain in place. The defendant was not required to remove any existing downed timber, trash, logs or debris, although they were frequently encountered. The clearing operations of the company did not extend above elevation 915 although there was a considerable growth of timber above that elevation up to the top of the flood pool at elevation 936 feet.

As heretofore stated, there are approximately 52,000 acres in the reservoir area up to contour 936 feet. There are approximately 42,000 acres up to contour 915 feet, the top of the normal pool. The defendant cleared a total of 12,700 acres. Of the total of 52,000 acres in the reservoir area, 40,000 acres are timbered. There are 857 miles of shore line in the project, of which 122 miles were cleared.

The defendant had six months in which to complete the larger second contract dated August 8, 1958. Seventy-five percent of the clearing was accomplished by the use of mechanical equipment. The defendant committed 60 tractors to this operation. Due to the short completion period specified in the contract along with a liquidated damages provision, the defendant was forced to work as much as possible, and therefore an unusually large amount of overtime was necessary. The District Engineer complimented the defendant upon the speed and quality of the work performed on the second contract and the supplemental agreement thereto. In a letter dated March 15, 1959, the District Engineer stated:

"Your performance on this contract has advanced to the point that it is now obvious that clearing operations will not delay filling of the reservoir as scheduled. Accordingly, I feel that it is appropriate at this time to give you, the prime contractor, my appraisal of your performance on this contract.

"The delays in placing the work under contract due to untimely congressional authorization and funding difficulties forced this office to establish an extremely limited per-

formance period to phase accomplishment with the scheduled reservoir filling and power production. I can now frankly state that at the outset I was skeptical concerning the ability of a contractor to maintain a schedule which would not affect the planned reservoir filling.

"Throughout your contract I have kept in close touch with your progress, and I must say that the speed with which you mobilized your forces and equipment to full production and the sustained high production by which more than 90 percent completion was attained in a little more than 4 months time has been most gratifying to me. It is noted that actual progress from the beginning up to the present time has been well ahead of that scheduled by you or expected by this office. Production and quality can be classed as excellent."

All of the defendant's employees on the project with the exception of the three night watchmen were paid in excess of the minimum wage specified by the Fair Labor Standards Act, and were paid time and a half for all hours worked in excess of eight hours in one day in accordance with the Eight-Hour Law. They were not paid on a basis of time and a half for hours worked in each week in excess of 40, however. Therefore, as to the majority of the workers the only question involved is one of overtime violations. The three night watchmen were paid on a weekly basis and in their case there is a question as to both minimum wage and overtime violations.

The function of the court in cases arising under the Fair Labor Standards Act is to apply *ad hoc* the general terms of the statute to an infinite variety of complicated industrial situations. 10 East 40th Street Building, Inc. v. Callus, 1945, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806.

The Fair Labor Standards Act has a long history of litigation with many of the decisions involving a judgment evaluation of degree so that the ultimate result has varied in accordance with the existing factual situation. Certain general principles are applicable to all Fair Labor Standards cases, however. In Mitchell v. Tune, D.C.W.D.Ark.1959, 178 F.Supp. 138, 143, this court said:

"In determining cases in this field there are certain general pronouncements of the Supreme Court of the United States to serve as guide posts. It should first of all be recognized that the Fair Labor Standards Act must be given a liberal construction. Mitchell v. C. W. Vollmer & Co. [349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196] supra. The second guiding factor is that the scope of the Act is not co-extensive with the power of Congress over commerce. 10 East 40th Street Building, Inc. v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806. The Supreme Court has further said that the determination of whether an employee is covered by the Fair Labor Standards Act should be made by practical considerations and not technical conceptions. Mitchell v. C. W. Vollmer & Co., supra."

To these general principles should be added the rule that the nature of the employer's business is not determinative, but that the application of the Act depends upon the character of the employees' activity. A. B. Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

The principal contention of the plaintiff in the instant cases is that the defendant and its employees were engaged "in commerce" within the coverage of the Fair Labor Standards Act in clearing certain areas of the Table Rock Reservoir. To support this contention the Secretary relies upon (1) the testimony of J. C. Pyle, hydraulic engineer, for the Corps of Engineers; (2) statement made in the Design Memorandum; (3) lack of Congressional appropriation for recreational aspect of the project; (4) the holding in Tobin v. Pennington-Winter Construction Co., 10 Cir., 1952, 198 F.2d 334; and (5) the general prohibition

against breaking a project down into various phases to determine coverage of the Act.

The testimony of Pyle, the principal witness for the plaintiff, was indefinite at best. On cross-examination he testified as follows:

"Q. Now, Mr. Pyle, do you mean to tell the court that this little bit of clearing that you did is going to have any real effect on the proper operation of the dam? A. I would like to say it this way. I would say that that type of clearing in the vicinity is desirable. If you get into the question it is necessary, that is a different question. I would be inclined to say that it is not necessary, but it is desirable from the standpoint.

"Q. From the standpoint of being necessary, if you felt it was going to interfere with the proper functioning of your dam, you would clear it, wouldn't you? A. Yes.

"Q. Because it would be foolish to spend millions of dollars on that dam and not spend a little bit more if it is going to interfere with the operation of it, wouldn't it? A. Yes. We didn't have to face the question, understand. If there wasn't any clearance for recreation or anything else. We actually didn't have to face that.

"Q. The chances are you wouldn't have cleared anything? A. I wouldn't make that statement because there are quite a few people in the Corps that feel that some clearing is needed.

"Q. Don't you think that this dam would have worked just as efficiently and that flood-control and navigation would have been handled just as effectively if you hadn't done any clearing as is the situation with what clearing you have done? A. I wouldn't attempt to predict—

"Q. You really don't expect any trouble with it, do you? A. Not now, no.

"Q. You don't expect any more trouble now than you would if you hadn't cleared any? A. I don't expect much trouble. We have had trouble at some of the projects.

"Q. Well, the change in thinking has been that it is just not necessary to clear these projects any more from the standpoint of flood-control, power and navigation. Now that is right. I believe you said that? A. Navigation is something else. Flood-control and power—Except for clearing, as I say, in the vicinity of the dam. You see, formerly they felt they would need to clear the whole lake.

"Q. They feel that is not necessary? A. They feel that is not necessary to clear nearly that much.

"Q. Well, at least you will concede, with the exception of maybe of a little bit of clearing right here, all of the rest of this clearing was clearly for just recreational purposes. Now you will concede that, won't you? A. It was cleared to control mosquitoes and for boat passage; the boats being primarily recreational boats.

"Q. It didn't have anything to do with flood-control or power? A. In my view, not up-stream in this area here, no.

"Q. I don't want to get crosswise. What is this about navigation. How could it have any effect on navigation? A. This is not a navigation project."

Hilton Keen, former employee of the Corps of Engineers and project engineer for the defendant on the Table Rock job, and Wade Lahar, President of the defendant company, both testified that the clearing accomplished by the defendant was done solely for recreational purposes, health benefits, boating, and to improve local property values.

The physical evidence supports the position of the defendant on this point. The evidence showed that only a portion of the trees within the reservoir were

removed, and that where trees were removed from one bank of the river or a tributary, they were left standing on the opposite bank. It was also shown that timber, logs and trash which were already on the ground within the reservoir area were not removed prior to the filling of the reservoir.

The plaintiff next relies on the provision in Design Memorandum No. 12, which lists as one of the factors considered in clearing the reservoir the reduction of maintenance problems caused by floatage and possible interference within the outlet works. However, as previously noted, in the paragraph dealing with the selection of clearing limits, it is stated:

> "The plans described herein for Table Rock provide for clearing only the reaches considered to be reasonably necessary from the standpoint of recreation and public use. The timber in the other reaches would be killed, resulting eventually in a large amount of drift, but lake velocities will be negligible and the drift would probably be concentrated locally by wind action where it would rot rather than float to the dam."

■ The lack of allocation of funds by Congress for the recreational aspect of the project is also relied upon by the plaintiff. It is true that all funds for the construction of the dam and reservoir came from appropriations for flood control and power. It should also be noted that no funds appropriated for navigation were used in the project. However, the plaintiff relies on the navigation aspect of the project to help prove his case. The argument that a determination of coverage under the Fair Labor Standards Act can be based solely on the Congressional appropriation is one based upon the technical conception approach which was condemned by the Supreme Court in Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196. The courts in cases such as this have no control over the allocation of funds appropriated by the Congress.

The primary case relied upon by the plaintiff in this litigation is Tobin v. Pennington-Winter Construction Co., supra. This was a Fair Labor Standards case involving the employees of the construction company having a contract with the Corps of Engineers for the clearing of the Tenkiller Ferry Reservoir on the Illinois River in Oklahoma. In that case the Court of Appeals for the Tenth Circuit held that the employees were covered by the provisions of the Act. A cursory reading of the opinion might lead one to believe that it supports the plaintiff's position in the instant cases. However, upon a careful reading of the opinion, it appears to be clearly distinguishable because of the factual situation in the instant cases. The clearing performed in the Tenkiller Ferry Reservoir was similar to that performed on the Norfork project on the White River previously referred to. All timber between certain elevations was removed, and the contract specified that all floatage material over four inches in diameter and five feet in length was to be removed. At the time the Tenkiller Ferry Dam and Reservoir were being constructed, the Corps of Engineers considered extensive clearing as being necessary for the protection of the dam and the proper functioning of the project. This view was adopted by the court. At page 336 of 198 F.2d the court said:

> "But of more vital significance is the fact that the major portion of the work in question consisted of removing trees, logs and obstructions which would float against the dam, tend to clog the intakes, damage the gates, and interfere with the operation of the hydroelectric power equipment and the spillway for the flood pools."

The evidence in the instant cases clearly establishes a change in the thinking of the Corps of Engineers relative to the requirement for clearing reservoirs. On the Table Rock project only modified clearing was accomplished, and floatage material was left in the reservoir. In the Pennington-Winter case there was unim-

peached testimony as to the necessity of clearing the reservoir. In the present cases the testimony introduced by the plaintiff does not establish any necessity for the clearing insofar as the functioning of the dam and reservoir are concerned, while the testimony introduced by the defendant of two qualified witnesses was to the effect that the clearing accomplished under the contracts had no beneficial aspect insofar as protecting the dam or aiding in its operation.

Finally the plaintiff relies on the judicial prohibition against breaking a project down into various phases to determine coverage under the Act. See Bennett v. V. P. Loftis Co., 4 Cir., 1948, 167 F.2d 286; Archer v. Brown & Root, Inc., 5 Cir., 1957, 241 F.2d 663. However, in the cases cited by the plaintiff the phase sought to be broken away was a necessary part of the over-all project. The court is convinced in the instant cases that the clearing performed by the defendant in the Table Rock Reservoir was not a necessary part of the over-all project and served no purpose in the protection or the operation of the dam. On the other hand, the court is convinced that the clearing operations performed by the defendant were strictly of a local nature.

■ The test with reference to "engaged in commerce" is set out by the Supreme Court in Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 75 S.Ct. 860, 861, 99 L.Ed. 1196, as being: "The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity."

■ Based upon the evidence introduced, the clearing operation of the defendant cannot be classified as being vitally related to the functioning of the dam, and must be considered isolated local activity. To arrive at this determination the court must of necessity draw a line between covered and non-covered activity. In reference to this, the Supreme Court said in 10 East 40th Street Building, Inc., v. Callus, supra, at page 584 of 325 U.S., at page 1230 of 65 S.Ct.:

"On the terms in which Congress drew the legislation we cannot escape the duty of drawing lines. And when lines have to be drawn they are bound to appear arbitrary when judged solely by bordering cases. To speak of drawing lines in adjudication is to express figuratively the task of keeping in mind the considerations relevant to a problem and the duty of coming down on the side of the considerations having controlling weight. Lines are not the worse for being narrow if they are drawn on rational considerations. It is a distinction appropriate to the subject matter to hold that where occupations form part of a distinctive enterprise, such as the enterprise of running an office building, they are properly to be treated as distinct from those necessary parts of a commercial process which alone, with due regard to local regulations, Congress dealt with in the Fair Labor Standards Act. Of course an argument can be made on the other side. That is what is meant by a question of degree, as is the question before us. But for drawing the figurative line the basis must be something practically relevant to the problem in hand. We believe that is true of the line drawn in this case."

■ The plaintiff next contends that the clearing activity of the defendant constitutes "production of goods for interstate commerce." To be considered as falling within the statutory definition of "produced," an activity such as this must be a clearly related process or occupation directly essential to the production of goods. 29 U.S.C.A. § 203(j).

Since the court has found that the clearing work performed by the defendant in the Table Rock Reservoir was not for the purpose of protecting the dam, or as an aid to its operation, but was in effect strictly local activity, it cannot be

held that the clearing work meets the statutory requirements.

█ The final contention advanced by the plaintiff is perhaps his most novel. Since the Table Rock Reservoir lies in both Arkansas and Missouri, and since admittedly the clearing performed by the defendant in the public-use areas would aid visitors in launching and using their boats, the Secretary contends that the clearing thereby improved and extended an instrumentality of commerce. This apparently is based on the theory that the boats will be able to move from one end of the reservoir to the other and in so doing would cross the Missouri and Arkansas state line.

The only boats mentioned in the testimony were pleasure boats presumably occupied by fishermen and other pleasure seekers. Further, much of the clearing work performed by the defendant was done along the banks of numerous tributaries flowing into the White River well above the dam. It was definitely established that the White River is not navigable at this point, and that the construction of the dam was not intended to aid or improve navigation above the dam site.

The court has found that the only purposes served by the clearing operations of the defendant were to aid recreation, health and local property values, and as such were strictly local activity. The court is unwilling to extend the coverage of the Act to include such local activity merely because the reservoir lies in two states. The White River at the point in question could not be considered an instrumentality of interstate commerce prior to the construction of the Table Rock Dam and Reservoir, and therefore the construction of the project cannot be considered an extension and improvement of an existing interstate instrumentality.

After consideration of all the evidence and of the various theories of coverage advanced by the plaintiff, the court is of the opinion that the work performed by the defendant's employees on the Table Rock Reservoir does not constitute engagement in interstate commerce or in the production of goods for interstate commerce so as to bring the employees within the coverage of the Fair Labor Standards Act. Rather the court finds that the clearing operation was strictly a local activity.

█ While certainly not controlling, the court feels it should mention the obvious conflict between Government agencies in projects of this nature. The Corps of Engineers awards construction contracts on the basis of competitive bids. In order to fairly apprise the prospective bidders of the scope of the work and probable expense involved, the Corps sets out in its specifications what it terms "applicable labor laws." The Fair Labor Standards Act is conspicuous by its absence. Such absence works a hardship for bidders on numerous "fringe" projects. This is particularly true when, as in this case, the Corps is demanding a short completion period which will require excessive overtime work. The Corps of Engineers is naturally interested in getting the work accomplished as fast as possible and for as little cost as possible. The Department of Labor, on the other hand, is apparently just as interested in having the Fair Labor Standards Act included in bid specifications on as many projects as possible. Somewhere in between is the contractor who must submit a competitive bid. The Comptroller General has refused to authorize the inclusion of the Fair Labor Standards Act in Government contracts and specifications.[1]

This situation certainly does not relieve a contractor of compliance with the

---

1. In a letter dated April 16, 1954, to the Secretary of Defense, the Comptroller General of the United States stated:
   "For those reasons, I am of the opinion that the proposed provision would tend to restrict competition and to increase the cost to the Government of the work to be done, and that compliance therewith may not be regarded as reasonably requisite to the accomplishment of work under a particular construction contract. See 18 Comp.Gen. 285. Hence,

Fair Labor Standards Act when applicable. However, it should be considered in determining whether the violation was a willful one and whether an injunction should be issued.

Since it is the opinion of the court that the activity in these cases is not covered by the provisions of the Fair Labor Standards Act, it is not necessary to pass on the question of issuing an injunction. However, it is noted that even if the project had been covered, the facts show conclusively that the defendant exercised good faith throughout the controversy and that it has expressed a willingness to abide by the court's decision on future projects of this nature if coverage had been sustained.

In accordance herewith a judgment is being entered today dismissing the complaint for an injunction in Civil No. 451, and dismissing the action for overtime and minimum wage compensation brought by the Secretary of Labor on behalf of certain employees in Civil No. 455.

This 6th day of January, 1960.

---

in the absence of statutory authorization therefor, there is no legal justification for the inclusion of such a minimum work week and overtime wage provision in the

Department of Defense construction specifications and contracts. See 17 Comp.Gen. 37; 20 id. 18; id. 24; 31 id. 561."